## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| J. STEVEN MANNING, | ) | |
| | ) | Civil Action No. 2:10-cv-178 |
| Plaintiff, | ) | |
| | ) | Chief Magistrate Judge Lisa Pupo |
| v. | ) | Lenihan |
| | ) | |
| THOMAS T. FLANNERY, *et al.*, | ) | ECF No. 49 |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## <u>OPINION</u>

<u>LENIHAN</u>, Chief Magistrate Judge

This diversity action arises from the alleged defamation of Plaintiff, tortious interference with existing and prospective contractual/business relationships, breach of fiduciary duty, and negligence by Defendants. Currently pending before the Court for disposition is Defendants' Motion for Summary Judgment (ECF No. 49). In support of this motion, Defendants argue that Plaintiff's claims are barred by the applicable statute of limitations, and even if not time barred, Plaintiff has failed to prove prima facie elements of his claims for defamation, tortious interference with existing and prospective contractual relationships, breach for fiduciary duty, and negligence. For the reasons set forth below, the Court will grant the motion for summary judgment as to all claims.

## I.     BACKGROUND & PROCEDURAL HISTORY

The following facts are set forth in the light most favorable to Plaintiff, the non-moving party, giving Plaintiff the benefit of all reasonable inferences.  Some of these facts are disputed and are so noted.

The crux of this lawsuit centers on the search for a new Vice President of Operations for Ardex, LP ("VP Operations") conducted by Defendants Boyden[1] and its agents, Thomas Flannery and Stacey Holland.  "Boyden specializes in senior executive search for a diverse client base that includes start-up, middle-market, and Fortune 500 companies" both nationally and globally.  (10/2/07 Engagement Letter at 1, Defs. Ex. 12, ECF No. 49-13 at 2; Compl. ¶3.)

In late 2004 and January of 2005, Ardex LP retained the services of Boyden to recruit an individual for the position of President and Chief Executive Officer of Ardex LP.  (Compl. ¶8.) Ardex LP (hereinafter "Ardex" or "Ardex USA") is a Pennsylvania limited partnership with its principle place of business located in Aliquippa, Pennsylvania.  (Exec. Agrmt. at 1, Defs. Ex. 16, ECF No. 49-17 at 2.)  As a consequence of Boyden's search, Plaintiff, J. Steven Manning, was hired by Ardex LP in January of 2005 to fill the President and CEO position,[2] and entered into a written Executive Employment Agreement with Ardex ("Executive Agreement") on January 31, 2005.  Subsequently, in 2007, the Executive Agreement was amended twice by letter agreement which, among other things, extended Manning's term of employment as President and CEO through December 31, 2009.  (Compl. at ¶9.)

---

[1] The parties collectively refer to Defendant Resources for Management, Inc., d/b/a Boyden (a registered fictitious name) and/or Boyden Global Executive Search and/or Boyden World Corporation, and Defendant Interim Management Associates, LLC, d/b/a Boyden and/or as Boyden Interim Management, as "Boyden."  The Court will do the same.

[2] Ardex also considered an inside candidate for the president and CEO position, Joe Pielert, who at the time was Vice President of Operations at Ardex.   When Manning was selected for the position, Pielert remained as VP Operations, and was potentially a logical successor to Manning.  (Flannery Dep. 8/27/08 at 65:18-25 – 66:1-3, Defs. Ex. 4, ECF No. 49-5 at 7-8.)

Manning reported to the Board of Directors of Ardex's general partner, Ardex Holding, Inc., and to the chief executive officer of Ardex Anlagen GmbH or Ardex Amerika Holding GmbH, at Witten Germany (collectively the "Management Companies").   (Exec. Agrmt. ¶1, Defs. Ex. 16, ECF No. 49-17 at 2.)    At all relevant times, Dieter A. Gundlach was the Chairman of the Board of Management of Ardex GmbH (Gundlach Letter to Zangemeister dated 3/4/08, Defs. Ex. 5, ECF No. 49-6 at 6) and, as such, was the person to whom Manning directly reported.

Between the time of his hiring in 2005 and the fall of 2007, several disputes arose between Manning and Gundlach[3] over, inter alia: (1) Manning's alleged refusal to relocate his residence from West Chester, New York, to Pittsburgh, Pennsylvania, within the stated time frame; (2) the amount of bonus money Manning received; (3) developing the South American market; and (4) Manning's statements towards Mark Eslamlooy[4] during a telephone conference regarding Ardex's development of the South American market, which were viewed as abusive and rude by Gundlach.  (Gundlach Dep. 4/12/11 at 2, Defs. Ex. 6, ECF No. 49-7 at 3.)  Plaintiff admits that he had some disputes with Gundlach, but takes issue with Defendants' characterization of the South American market dispute as "refusing to comply with directives from Gundlach over the South American market," or the characterization of Manning's conduct towards Mr. Eslamlooy as rude.   (Pl.'s Resp. CSMF ¶8, ECF No. 58 at 5-6.)

In September of 2007, Joe Pielert, then VP Operations, left Ardex.   Subsequently, Boyden was hired by Ardex to recruit a new VP Operations.   The October 7, 2007 engagement

---

[3] A summary of these disputes is found in Gundlach's 2/28/08 Memo (Defs. Ex. 5, ECF No. 49-6), the deposition transcripts of Gundlach dated 4/12/11 (Defs. Ex. 6, ECF No. 49-7) and Eslamlooy dated 4/12/11 (Defs. Ex. 7, ECF No. 49-8), and Gundlach's 8/30/07 Memo (Defs. Ex. 8, ECF No. 49-9).
[4] Mr. Eslamlooy was the finance manager/CFO for Ardex world-wide.  (Eslamlooy Dep. 4/12/11 at 3, Defs. Ex. 7, ECF No. 49-8 at 4; Gundlach Dep. 11/17/08 at 68:11-17, Defs. Ex. 10, ECF No. 49-11 at 10.)

letter provided, in relevant part, that Boyden was "ready to begin a search for a Vice President, Operations for Ardex/Henry[,]" and outlined the key elements of the search process.   (10/2/07 Engagement Letter at 1-4, Defs. Ex. 12, ECF No. 49-13 at 2-5.)   As part of the process, Boyden represented that "[d]uring the course of the assignment, we will maintain regular contact with you by e-mail or phone at a mutually agreeable interval." (*Id.* at 2.)  Flannery further stated that Boyden hoped the key elements outlined in the letter would be a "continuation of the long-term partnership between Boyden and Ardex America." (*Id.* at 5.)  The engagement letter was addressed to "Mr. Steve Manning – President and CEO, Ardex America" and denoted as "Personal and Confidential." (*Id.* at 1.)   Boyden maintains that its client was Ardex, the company and its shareholders.  (Holland Dep. 8/26-27/08 at 79:9-25 – 80:1-19, Defs. Ex. 13, ECF No. 49-14 at 8-9; Flannery Dep. 8/27/08 at 142:12-22, Defs. Ex. 4, ECF No. 49-5 at 13.) Manning disputes this and contends that the engagement letter reflects that he was the client, not Ardex.  (Pl.'s Resp. CSMF ¶11, ECF No. 58 at 7-8.)

On or about 9/24/07, Gundlach telephoned Flannery to discuss the new recruitment. During that conversation, Gundlach and Flannery agreed that Ardex needed a strong individual in the position of VP Operations who could figure in succession planning given the lack of strong management talent behind Manning.  (Flannery Dep. 4/27/11 at 14:7-16, Pl.'s Ex. 4, ECF No. 59-4 at 3.)   Manning contends that this conversation was "designed in part to establish a means by which Flannery and the other instant defendants would communicate to Gundlach and his surrogates (i.e., Hugh Nevin) on a 'confidential' basis information which they claim to possess concerning the plaintiff and by which means Flannery and the other instant defendants could defame and disparage the plaintiff." (Defs. CSMF ¶13 (citing Compl. at ¶29a), ECF No. 51 at 3.)

Manning's position was predicated upon the content of the 9/25/07 letter sent from Flannery to Gundlach and marked "PERSONAL AND CONFIDENTIAL". (Pl.'s Resp. CSMF ¶13, ECF No. 58 at 8.)   In that letter, Flannery discussed Boyden's position regarding the search that Manning wanted to conduct for VP Operations.  Flannery questioned Manning's strategy of making the new VP Operations responsible for manufacturing operations, logistics and environmental issues for both Ardex and W.W. Henry, as the person hired would not likely be a successor to Manning if Manning were to leave Ardex.  This raised vulnerability issues with Flannery—the organizational structure contemplated by Manning "puts more control in his hands and appears to diminish the responsibilities of his senior management team.  [Flannery was] concerned that changing the organization in the manner will make the company more vulnerable if Steve does leave and that it would give Steve too much leverage in is negotiations with you."  Flannery further stated that he wished the contents of this correspondence to remain confidential and to have a further discussion with Gundlach on this matter. (Defs. Ex. 14, ECF No. 49-15.)

The contents of this letter were not communicated to Manning while he was employed at Ardex.  (Flannery Dep. 4/27/11 at 14:17-25 – 16:1-3, Pl. Ex. 4, ECF No. 59-4 at 3.) When asked why he believed the contents of the letter should be kept confidential, Flannery ultimately stated that he did not want to upset the balance that existed between Gundlach and Manning.  (Flannery Dep. 4/27/08 at 69:11-25 - 70:1-7, Defs. Ex. 4, ECF No. 49-5 at 11-12.)  As to what he meant by "too much leverage" in his 9/25/07 letter, Flannery explained that he meant "[e]ssentially having a gun to Mr. Gundlach's head saying if I have to relocate, I will leave." (*Id.* at 68:20-22.)

On 10/12/07, Gundlach informed Manning via email that when the search produced two "final candidates" he wanted to meet the candidates personally before an employment agreement

was signed.  (Defs. Ex. 17, ECF No. 49-18.)  Over the next several months, several outside and inside candidates were interviewed for the VP Operations position.

On 1/28/08, Flannery sent an email to Gundlach providing an update on the search for a VP Operations, which included an email from Stacey Holland dated 1/25/08.  (Defs. Ex. 18, ECF No. 49-19.)  Flannery indicated that Ardex was considering two outside candidates (Fuller and Brengel) whom Flannery described as strong, and one inside candidate (Masterson) who was described as "so-so."  (*Id.*)  Flannery further stated in this email that he was concerned that Manning would not pick the strongest candidate "because [Steve] is reluctant to bring someone into the organization that could succeed him.  Steve is in a very strong position at the moment, knowing that he cannot be replaced from the inside if he leaves the company.  Both Stacey and I think that if Steve leaves for any reason that there should be someone in place who could replace him, even if it would be for the short term."  (*Id.*)  Manning contends that Flannery's statements quoted above were intended to undermine him to Gundlach.  (Defs.' CSMF ¶24 (citing Compl., ¶29d); Pl.'s Resp. CSMF ¶24.)

On 2/5/08, Gundlach emailed Manning inquiring as to whether there were any final candidates with whom he could meet during Gundlach's visit to Ardex's facilities in Pittsburgh on February 12-14, 2008.  (Defs. Ex. 19, ECF No. 49-20.)  Gundlach also emailed Flannery on that same date informing him that he had asked Manning whether he could meet some of their "final" candidates while in Pittsburgh.  (Defs. Ex. 20, ECF No. 49-21.)   In response to Gundlach's email sent earlier that day, Manning wrote that they had interviewed a number of quality candidates through the search process and, while they were continuing the search, Jim Masterson (internal candidate) was currently the leading candidate.  (Defs. Ex. 21, ECF No. 49-22.)  Manning further stated that if Gundlach was interested in meeting with Masterson during

6

his visit, Manning would set it up and forward a copy of Masterson's CV.  (*Id.*)  Also on 2/5/08,

Holland sent Angelo an email regarding Holland's conversation with Vern Fuller informing him

that he was not selected and her attempts to contact Bill Brengel and inform him he was no

longer a candidate.  (Defs. Ex. 45, ECF No. 61-1 at 44.)

On 2/7/08, Flannery sent an email to Gundlach informing him that Manning (via Lori

Angelo[5]) instructed Holland to release all of the outside candidates and to put the search on hold.

(Defs. Ex. 22, ECF No. 49-23.)  Flannery further wrote that although he and Holland complied

with Manning's instruction, they were "concerned that [they we]re losing an excellent candidate,

Bill Brengel, who has a strong interest in the position, and that there is lack of sufficient

management strength behind Steve to have a viable succession plan."  (*Id.*)   Flannery further

stated that if Gundlach and Manning concluded that it made sense to bring Brengel back in, they

would do their best to retrieve him.  (*Id.*)

In a subsequent email from Gundlach to Manning on 2/7/08, Gundlach wrote that "our

group standard for such crutial/critical (sic) positions within the recruting (sic) process is to have

at least 2 up to 3 alternativ (sic) candidates.  Therefore I would like to make sure to have the

opportunity to meet  . . . 2/3 external candidates who were already interviewed from you within

the project."  (Defs. Ex. 23, ECF No. 49-24.)   Gundlach also forwarded this email to Flannery,

without notification to Manning.  (*Id.*; Pl.'s Resp. CSMF ¶30.)  On 2/8/08 at 7:13 a.m., Manning

sent a reply email again informing Gundlach that the outside candidates had been released and

that he (Manning) wanted to move forward with Masterson.  (Defs. Ex. 24, ECF No. 49-25.)

Manning further wrote that the outside candidates had been notified that they were not selected,

---

[5] Lori Angelo worked for Manning and was the primary contact person with Defendants over the search for a VP Operations.

and therefore, it would "obviously be very difficult and very awkward to call the others back in again." (*Id.*)   Later that same date, Gundlach responded to Manning via email reminding Manning that back in October, he asked to interview multiple candidates before a contract was signed. (Defs. Ex. 25, ECF No. 49-26.)   Thereafter, at 10:32 a.m., Manning replied, repeating to Gundlach that he had already let the outside candidates go and only Masterson was available for an interview. (Defs. Ex. 26, ECF No. 49-27.)   Manning further stated:   "There has not been a commitment made to Jim, as we do not consider the search process fully completed.   It would be a convent (sic) opportunity for you to interview Jim while you are here.   Consistent with the agreement you and I made, a VP position would be filled with discussion and agreement with Germany.   Hopefully this clarifies the status and will aid in the process." (*Id.*)

The parties dispute some of the events that occurred on 2/12/08.   Defendants submit that when Gundlach arrived at Ardex USA on 2/12/08, Manning told him that the outside candidates "were not available." (Defs. CSMF ¶34, ECF No. 51 at 6.)   Conversely, Manning describes his encounter with Gundlach as follows:

> [At] approximately 4:30 pm [Gundlach] . . . asks me to bring in VP Ops candidates for him to see.   I explain that we already had the discussion, that we already notified the candidates that they were no longer in contention, and (Lori) had already instructed Boyden to release the candidates.   Gundlach then said "Steve, I trust your judgement, (sic) you're doing a fine job, but the Board is requiring me to interview at least 2 candidates."   I also told Gundlach that they were mostly from out of town, had jobs, and did not think it possible on such short notice.   I also stated that I had an ethics issues (sic) bringing back people for interviews when we had no intention of hiring them and already told them so.   He then said "Boyden is professions, (sic) have them say something, whatever they need to, to be clever. (sic) I objected again, but [Gundlach] said well try.

Manning Memo/Timeline dated 3/31/08 at Manning 1504 (Defs. Ex. 9, ECF No. 49-10 at 11).

The parties agree that when Gundlach insisted on interviewing the outside candidates, Manning

instructed Lori Angelo to call Stacey Holland about the situation.  (Defs. CSMF ¶35; Pl.'s Resp.

CSMF ¶35.)  Manning described what happened next:

> I left my office, and relayed the situation to Lori. She said
> something to the effect ... "what, that's crazy, we can't do that,
> that's just wrong." I agreed and said "I agree ... we can't do that, I
> have a real ethics problem with this, but ... Gundlach is insisting so
> we have to." I then told Lori "call Stacy, let her know what's going
> on, and have her handle this. I'm sure there's no way she can get
> them in on such short notice, plus we've already told them they
> weren't in the running anymore. This is real BS". Lori and I
> exchanged astonished words. At that point I told her to call Stacy,
> and to also tell Stacy not to be surprised if she gets a call from
> Hugh Nevin (C&G) on behalf of Gundlach. Lori left the area in
> front of the conference room, went to her office, and I assume
> called Stacy as I had asked. Lori informed me later that Stacy was
> not in, but she had left a message for Stacy. Day ended that way,
> and I had no other discussion with [Gundlach] on the topic.

Manning Memo/Timeline at Manning 1504 (Defs. Ex. 9, ECF No. 49-10 at 11).

Later on 2/12/08, two telephone calls were exchanged between Lori Angelo & Stacey

Holland, which are at the heart of the Plaintiff's defamation claim.  First, Holland returned

Angelo's call, during which Angelo relayed the situation with Gundlach and his request to get

the two outside candidates back in for him to interview while he was in Pittsburgh.  Angelo then

stated, "you can't call them back in after we already released them, can you?"  (Manning

Memo/Timeline at Manning 1504, Defs. Ex. 9, ECF No. 49-10 at 11; *see also* Angelo Dep.

8/19/08 at 239:4-9, Defs. Ex. 27, ECF No. 49-28 at 5; Holland Dep. 8/26-27/08 at 81:8-13, Defs.

Ex. 13, ECF No. 49-14 at 11.)   Holland told Angelo that the two outside candidates, Fuller and

Brengel, could come into town for an interview, but that if they were not seriously being

considered for the position, it would be unethical to ask them, and Angelo agreed with that

decision.  (Holland Dep. 8/26-27/08 at 82:20-25 to 83:6; Angelo Dep. 8/19/08 at 239:8-22, Defs. Ex. 27, ECF No. 49-28 at 5.)  Angelo and Holland further discussed whether Holland would have a problem if Angelo and Manning told Gundlach that there was not sufficient time to get the outside candidates back in, as Angelo was uncomfortable telling Gundlach, the global CEO, that his request was inappropriate and unethical.  (Angelo Dep. 8/19/08 at 240:18-25 to 241:7, 242:6-20, ECF No. 49-28 at 6-8; Angelo Dep. 4/26/11 at 64:11-20 & 65:19 to 66:1, Defs. Ex. 40, ECF No. 61-1 at 11-13.)

Angelo placed a subsequent telephone call to Holland on 2/12/08 but was only able to leave a message on Holland's voice mail.  (Holland Dep. 8/26-27/08 at 88:3-10, Defs. Ex. 13, ECF No. 49-14 at 14.)  Angelo testified that she was calling at the direction of Manning to tell Holland to make sure that Flannery knew why the other candidates were not being asked to come back for an interview with Gundlach, in the event Flannery gets a call from Nevin[6] or Gundlach. (Angelo Dep. 4/26/11 at 17:22 to 19:11, Pl.'s Ex. 9, ECF No. 59-9 at 4; Angelo Dep. 8/19/08 at 240:11-15, Defs. Ex. 27, ECF No. 49-28 at 6.)  Conversely, Holland testified that she recalled the message left by Angelo was that Angelo would be "uncomfortable if Stacey shared the details with Tom regarding the last conversation," and that Angelo was asking her to keep the details of their conversation about it being unethical from Flannery.[7]  (Holland Dep. 8/26-27/08 at 87:4-25 & 88:17-22, Defs. Ex.13, ECF No. 49-14 at 13-14; Holland Timeline at BOY 000046, Defs. Ex. 33, ECF No. 49-34 at 6.)

---

[6] At all relevant times, Hugh Nevin was an attorney with the law firm of Cohen and Grigsby and served as corporate secretary of Ardex USA.  (Defs. Ex. 6, Gundlach Dep. at 3, ECF No. 49-7 at 4.)

[7] In her timeline, Holland wrote that the voice mail message from Angelo stated:  "it would be 'uncomfortable' if Stacey shared all of the details with Tom regarding the last conversation and invoked Mr. Gundlach's name and that Tom knows Hugh Nevin, etc. and all of them link to Steve Manning." (Holland Timeline at BOY 000046, Defs. Ex. 33, ECF No. 49-34 at 6.)

The next day, 2/13/08, Angelo relayed her telephone conversation with Holland to Manning. (Manning Memo/Timeline at Manning 1504, ECF No. 49-10 at 11.) Manning recalled that: "Lori also stated that she told Stacy that she may get a call from [Gundlach] or Nevin directly. Stacy then told Lori (per Lori) that 'Tom will know how to handle that'." Manning Memo/Timeline at Manning 1504 (Defs. Ex. 9, ECF No. 49-10 at 11).

Manning also described his encounter with Gundlach later on 2/13/08:

> Late in the day [Gundlach] asked if I had gotten the candidates scheduled. I explained that they were from out of town, they had jobs, and that we had already dismissed them. [Gundlach] didn't care, and asked if I call the candidates. I told him that I asked Lori to handle that after he and I spoke the previous day. [Gundlach] then asked me if candidates were scheduled. I told him "Lori said no, they were not available." Lori later told me late that evening that Stacy called back (again) spoke to Lori and said she may be able to call Bill Bringle, as he was unemployed. I had already told [Gundlach] the situation and did not want to raise it again.

Manning Memo/Timeline at Manning 1504 (Defs. Ex. 9, ECF No. 49-10 at 11). Gundlach interviewed the internal candidate, Masterson, before he left Pittsburgh, but not the external candidates.

On 2/14/08, Gundlach sent Flannery a copy of an email sent by Manning indicating that the search was not closed and that Boyden was continuing to look for additional qualified candidates. (Defs. Ex. 29, ECF No. 49-20 at 2-3.) However, Flannery and Holland maintain that as of 2/14/08, neither Angelo nor Manning had asked Boyden to continue the search and the search was still on hold as far as they knew. (Confidential Memo from Flannery/Holland to Gundlach & Nevin 3/6/08 ("Flannery/Holland Memo 3/6/08") at 2, Defs. Ex. 35, ECF No. 49-36 at 3.)

Sometime thereafter but before 2/18/08, Gundlach left a voice mail for Flannery indicating that Manning had told him that Boyden could not be reached and this is why candidates did not get presented to Gundlach during his visit.  (*Id.*)   Later that same week but prior to 2/18/08, Flannery telephoned Gundlach wherein he suggested that Gundlach call Holland because, according to Gundlach, she "is concerned because during the search for the VP operational, the development was not going well, was not well or something like that." Flannery also pointed out to Gundlach that Holland "has problems in cooperation with Ardex (re: Manning)" and he advised Gundlach to contact Holland.   (Compl., ¶29f.)   Subsequently, Gundlach telephone Holland and during that conversation, Holland stated that she did not feel "comfortable" conveying "unpleasant and not nice information."   (Gundlach Dep. 11/17/08 at 36:2-6, Defs. Ex. 10, ECF No. 49-11 at 3.)  She informed Gundlach that the candidates could have been called if Ardex had a genuine interest, that Angelo had been told that numerous times, and that Angelo and Holland spoke about this issue before Gundlach was in town. (Flannery/Holland Memo 3/6/08 at 2, Defs. Ex. 35, ECF No. 49-36 at 3.)   Holland also told Gundlach that Angelo had asked her not to reveal to Flannery the contents of their conversation on 2/12/08 (the "don't tell Tom" voice mail or statement).  (Gundlach Dep. 11/17/08 at 37:9-14, Defs. Ex. 10, ECF No. 49-11 at 4; Holland Dep. 8/26-27/08 at 87:21-25, 88:13-22, & 89:9-15, Defs. Ex. 13, ECF No. 49-14 at 13-15.)

Angelo testified that she did not learn that Holland had communicated to Flannery, Nevin and Gundlach a different version of Angelo's voice mail message, i.e., that Angelo told Holland not to tell Flannery about their conversation on 2/12/08, until Angelo was preparing for her

8/19/08 deposition in the *Ardex* litigation.[8]  (Angelo Dep. 4/26/11 at 13:1-15 & 17:5-11, Pl.'s Ex. 9, ECF No. 59-9 at 3-4.)  Angelo disputes Holland's version of Angelo's voice mail message. (Angelo Dep. 4/26/11 at 12:10-25 & 17:12-21, Pl.'s Ex. 9, ECF No. 59-9 at 2 & 4.)    In particular, when asked at her deposition whether she ever told Holland not to reveal the contents of their conversation on 2/12/08 to Flannery, Nevin or anyone else, Angelo replied, "No."  (*Id.*) Moreover, Angelo testified that the reason for her subsequent telephone call was to make sure Flannery was aware of her earlier discussions with Holland on 2/12/08 in the event he received a call from Hugh Nevin.  (*Id.* at 17:22 to 18:16, ECF No. 59-9 at 4.)

On 2/18/08 at 10:12 a.m., Gundlach emailed Flannery, stating that Holland informed him of Angelo's/Manning's course of action regarding the requested interviews with candidates. Gundlach commented that Angelo's statement that "an interview is not possible, is it?" was "definitely a clear interference so that a meeting should not take place."  (Defs. Ex. 31 at BOY 000038, ECF No. 49-32 at 3.)   With regard to Angelo's alleged instruction to Holland to not tell Flannery about this, as he may tell Nevin, who in turn would tell Gundlach, Gundlach further commented to Flannery that "[t]his approach is of course absolutely inacceptable (sic) and shows once again that Steve is disloyal towards me.  That he should even use his staff (Lori) to achieve this is highly reprehensible.  Should it be necessary to have a written statement regarding this occurrence can I rely on your support in this matter?"  (*Id.*)   Gundlach testified that he was disturbed and angry by what Holland told him.  (Gundlach Dep. 11/17/08 at 39:12-13, Pl. Ex. 7, ECF No.. 59-7 at 2.)

---

[8] The "*Ardex* litigation" refers to the lawsuit filed by Manning against Ardex in federal court in the Eastern District of PA over his termination and Ardex's invocation of the non-compete clause in the Executive Agreement.

Later that day, at 2:40 p.m., Flannery responded to Gundlach's earlier email that day to both Gundlach and Nevin, stating: "I am very disappointed in Steve's handling of this situation and I believe that [h]e has worked in his own best interests rather than those of Ardex." (Defs. Ex. 31 at BOY 000037, ECF No. 49-32 at 2.) Neither Gundlach nor Flannery ever attempted to confirm Holland's "don't tell Tom" version of the voice mail with Angelo. (Gundlach Dep. 11/17/08 at 79:4-9, Pl. Ex. 7, ECF No. 59-7 at 6; Flannery Dep. 4/27/11 at 39:23 – 40:1, Pl. Ex. 4, ECF No. 59-4 at 8.)

On 2/24/08 or 2/27/08,[9] Manning and Angelo spoke with Holland in person about continuing the search for a VP Operations. (Angelo Dep. 8/19/08 at 226:19 to 227:4, Pl. Ex. 10, ECF No. 59-10 at 2.) Manning and Angelo indicated that although they were still considering Masterson, they wanted Boyden to continue the search. (Flannery/Holland Memo 3/6/08 at 2, Defs. Ex. 49-36 at 3; Angelo Dep. 8/19/08 at 227:1-12, 228:19-24, ECF No. 59-10 at 2.) Manning stated that he wanted someone who has not yet been a VP Operation and for whom the position would be a "step up" due to the enthusiasm it would provide to the candidate. (Flannery/Holland Memo 3/6/08 at 2, Defs. Ex. 49-36 at 3; Angelo Dep. 8/19/08 at 227:17-23, ECF No. 59-10 at 2.) Also during that meeting, in response to Manning/Angelo's direct question as to whether she or Flannery were communicating with Gundlach regarding the search for the VP Operations or for any other purpose, Holland allegedly responded in the negative. Holland also allegedly stated to Manning and Angelo in response to a direct question posed to her that she knew of no difference between Manning's and Gundlach's position, specifications and/or

---

[9] Plaintiff alleges that this conversation occurred on 2/24/08 (Compl., ¶29m), while Holland testified that this conversation took place on 2/27/08 (Holland Dep. 8/27/08 at 151:25 – 152:1-4, Defs. Ex. 13, ECF No. 49-14 at 19-20.) For purposes of the summary judgment motion, Defendants do not dispute the exact date of this conversation. (Defs. CSMF ¶57 n. 5, ECF No. 51 at 9.)

expectations with regard to the VP Operations position.   (Defs. CSMF ¶58 (citing Compl., ¶29m), ECF No. 51 at 9; Pl.'s Resp. CSMF ¶58.)

On 2/25/08, Flannery and Nevin spoke via telephone conference regarding Gundlach's 2/18/08 email (10:12 a.m.) to Flannery.  (Nevin Dep. at 58:10 to 59:2, Pl.'s Ex. 11, ECF No. 59-11 at 2.)  Nevin testified that he concurred with Gundlach's statement that Manning's use of his subordinate Angelo to attempt to hide Angelo & Holland's discussion from Flannery was highly reprehensible and grounds for firing Manning.  (*Id.* at 59:14 to 60:2; ECF No. 59-11 at 2.)  Nevin also testified that Flannery expressed a concern that Manning would not pick the strongest candidate because he was reluctant to bring someone into the organization who could succeed him. (Nevin Depo. at 36:18-23, Defs. Ex. 32, ECF No. 60-35 at 4.)  From this conversation with Flannery, Nevin testified it was his impression that Flannery understood that Nevin would be discussing the situation with Gundlach.  (*Id.* at 63:7-10.)

Following his conversation with Flannery, Nevin called Holland.  (Nevin Dep. at 63:12-19, Defs. Ex. 32, ECF No. 60-35 at 7.)   Nevin asked Holland about the VP Operations search. (Defs. CSMF ¶61; Pl.'s Resp. CSMF ¶61.)  Holland reiterated her version of the voice mail message received from Angelo on 2/12/08, maintaining that Angelo told her that neither Nevin nor Gundlach should be told of the discussion between Angelo and Holland regarding bringing the candidates back in.  (Nevin Dep. at 66:19-23, ECF No. 60-35 at 10.)   Nevin then asked Holland to prepare a time line of events regarding the search issues.  (Holland Dep. 8/26-27/08 at 50:10-23, Defs. Ex. 13, ECF No. 49-14 at 4; Holland Timeline 3/3/08 at BOY 000045 - 000047, Defs. Ex. 33, ECF No. 49-34 at 5-7.)   Nevin did not attempt to verify Holland's version of the "don't tell Tom" voice mail with Angelo because he was instructed by Gundlach not to speak with anyone at Ardex.  (Nevin Dep. at 67:11-17, Defs. Ex. 32, ECF No. 60-35 at 11.)

On 2/28/08, Gundlach presented a memo to the Board of Directors in Witten, Germany proposing a resolution on the removal of Steve Manning as CEO of Ardex USA.  (Defs. Ex. 5, ECF No. 49-6; Gundlach Dep. 4/12/11 at 4, Defs. Ex. 6, ECF No. 49-7 at 6.)  In his 2/28/08 memo, Gundlach outlines the reasons he is requesting that Manning be terminated and requests approval by 3/3/08. (Gundlach Memo 2/28/08 at 2 & 4, Defs. Ex. 5, ECF No. 49-6 at 3 & 5.) Specifically, the grounds identified by Gundlach included: (1) lack of confidence; (2) Manning's dialogue was marked by a high degree of aggressive behavior towards the management in Witten and the employees; (3) lack of acceptance of the Ardex culture and its success factors; (4) targeted measures by Manning to achieve the termination of Peilert; (5) manipulation during the search for VP Operations; and (6) lack of support for Ardex worldwide goals (i.e., development of South American markets and employee exchange program).  (Id. at 2-3, ECF No. 49-6 at 3-4.) The resolution was subsequently approved by the Board of Directors on 3/6/08.  (Id. at 4, ECF No. 49-6 at 5; Gundlach Letter to Zangemeister 3/4/08, Defs. Ex. 5, ECF No. 49-6 at 6.)

Holland completed the time line requested by Nevin which was memorialized in a memo to Flannery dated 3/3/08.  (Defs. Ex. 33, ECF No. 49-34 at 5-7.)   Also on 3/3/08, Flannery emailed a letter to Gundlach expressing his concern about resuming the search for VP Operations when it was not clear if Manning and Gundlach were in agreement on the specifications for the position.  (Defs. Ex. 34, ECF No. 49-35 at 2-7.)  Flannery sought direction from Gundlach before continuing the search for VP Operations as he believed Manning would continue to reject future candidates until Masterson was selected by default.  (Id., ECF No. 49-35 at 4.)  Flannery also expressed his disappointment in Manning's behavior over the past five months, stating:

> Our relationship with Steve has deteriorated during this most recent search engagement and I am sorry to say that I think he has not acted in the best interests of Ardex.  We have provided Hugh

> Nevin with a timeline and details of our recent conversations and correspondence with Steve in which he has attempted to hide from you the fact that we had candidates who were prepared to meet with you.  I fault both his reasoning and his actions and I cannot begin to guess why he chose to behave in such a manner.
>
> I hope that Steve will realize his obligation to do the best for the company and that he will accept the need to bring strong managers to the company, but I can also assure you that there are other people who can ably fill his role, both on an interim and permanent basis.  Whatever your decision regarding Steve's future with Ardex may be, rest assured that we will continue to work with you to build and strengthen your U.S. operations.

(*Id.*, ECF No. 49-35 at 4-5.)     Flannery's statement in the second paragraph quoted above suggested to Gundlach that if Gundlach were to fire Manning, Flannery could obtain personnel to fill the position of president and CEO on an interim and permanent basis.  (Flannery Dep. 8/28/08 at 158:10-20, Defs. Ex. 43, ECF No. 61-1 at 29.)     Flannery could not say for sure whether Boyden profited from Manning's firing, even though Gundlach eventually hired Boyden to conduct the search for Manning's replacement for a fee of $90,000, because this fee was a significant reduction from Boyden's normal fee.  (*Id.* at 159:24 to 160:14, ECF No. 61-1 at 30-31.)

On 3/6/08, the Board of Directors in Germany approved Manning's termination. (Gundlach Memo 2/28/08 at 4*,* Defs. Ex. 5, ECF No. 49-6 at 5.)   On that same date, Flannery and Holland sent a confidential memo to Gundlach and Nevin summarizing the events emanating from the search for a VP Operations for Ardex USA, in which they stated, "In our opinion, Steve Manning has acted in a manner inconsistent with his role as President of Ardex, USA.  He was not responsive to us during the interview process and in the end he lied to his direct superior when he told Mr. Gundlach that Boyden could not be reached. We think that he is acting in his own best interest rather than in the best interests of Ardex and that he has been insubordinate in

his behavior.  We are concerned that he has damaged his credibility to the point that he can no longer be viable as the head of Ardex, USA."  (Flannery/Holland Memo 3/6/08 at 3, Defs. Ex. 35, ECF No. 49-36 at 4.)

On 3/11/08, Plaintiff's employment with Ardex USA was terminated for cause.  (Defs. CSMF ¶77; Pl. Resp. CSMF ¶77.)    At the time of his discharge, Manning was informed by Gundlach that Gundlach was unhappy with the handling of the search for a VP Operations and that Manning was being terminated for cause.  (Jokelson Ltr. to Carson dated 3/12/08 at 1, Defs. Ex. 36, ECF No. 49-37 at 2.)  On 3/12/08, Plaintiff's counsel sent a letter to counsel for Ardex requesting *inter alia* a statement of the reason(s) for Plaintiff's termination and all documents supporting the reason(s) for Plaintiff's discharge, including any documents regarding the Board of Directors approval of the termination.  (*Id.* at 2, ECF No. 49-37 at 3.)  On  3/19/08, counsel for Ardex provided a written response, indicating that Manning was terminated for "willfully misleading senior management about the search for someone to fill the position of Vice President Operations."  (Prorok Ltr. to Jokelson dated 3/19/08 at 1, Defs. Ex. 37, ECF No. 49-38 at 2.) Ardex's counsel further informed Plaintiff's counsel that Ardex had no obligation to provide Manning with any and all documents supporting his discharge, except to the extent such documents were part of his personnel file, which they were not, and Manning already possessed the documents pertaining to his Executive Agreement.  (*Id.*)  Ardex's counsel further responded that Ardex was not required to disclose the specifics of Board consideration and actions to Manning.  (*Id.* at 2, ECF No. 49-38 at 3.)

Subsequently, on 3/31/08, in response to a 3/30/08 letter from Plaintiff's counsel, counsel for Ardex further elucidated upon the reason for Plaintiff's termination:    "Mr. Manning represented to Ardex as ongoing the search for a Vice President, Operations at a time when

18

William (sic) Masterson, his preferred personal choice, was the only candidate under consideration.  The recruiter for the Vice President, Operations position had been instructed to discontinue efforts with regard to other identified candidates."  (Prorok Ltr. to Jokelson 3/31/08, Defs. Ex. 38, ECF No. 49-39 at 2.)

On 3/31/08, Plaintiff prepared his own timeline of the events that occurred leading up to his termination.  (Defs. Ex. 9, ECF No. 49-10.)   In that memo/timeline, Manning wrote:

> On 3-7-08 Flannery provided DG with a letter providing his opinion of the VP Ops search, in which Flannery allegedly states that SM has lost external credibility, has acted in a self-serving manner, has not been available during the search, and in his opinion is not fit to run the company and should be removed. This is the document Mark Eslamlooy referred to having seen in his conversation with Lori, week o[f] 3-10-08 where he stated he saw "third party evidence" and he was "shocked".

Manning Memo/Timeline 3/31/08 at Manning 1507 (Defs. Ex. 9, ECF No. 49-10 at 14).[10]  On 3/12/08, Manning noted that Angelo told him about her conversation with Eslamlooy the previous day, wherein Eslamlooy was "absolutely shocked at the document [Flannery/Holland 3/6/08 Memo] that DG showed him" which Gundlach was presenting to the Board of Directors. (Manning Memo/Timeline at Manning 1508, ECF No. 49-10 at 15.)   Another entry by Manning indicates that he discussed the Flannery/Holland 3/6/08 Memo with his former secretary, Erica Daxbeck on or around 3/13/08:

> ED stated that she had information (from Brigit) that the document she (Erika) accidentally saw on her computer (left by ME) was the document that Flannery sent to DG on the 6th, and that was the "third party evidence" that DG showed to Sengenmeister on Friday 7th to get his approval to terminate SM.

---

[10] "DG" refers to Dieter Gundlach; "SM" refers to Steve Manning.

(*Id.* at Manning 1509, ECF No. 49-10 at 16.)[11]

In addition, Manning noted:

> SM - I am very concerned and suspect that Flannery fabricated
> and/or misrepresented information for the purpose of allowing DG
> to fire me, and in return, be awarded the CEO search. I believe
> that this was a complete set up and fabrication. Why would
> Flannery want, need, or be given emails between me and DG?
> Why conference calls on the topic days <u>after my termination</u>?
> What do my emails to DG have relevance to Flannery . . . after the
> fact? Are they trying to get their stories straight in the event I
> challenge?   . . . I do not understand how Flannery has any first
> hand information about any of this, let alone be able to write a
> document involving conversations where people were 2 and 3
> times removed. This sounds like the classic case of pronouncing
> the guilty verdict, and then scrambling and twisting and fabricating
> things to create substantiating "facts".   I believe that
> Sengenmeister was intentionally given bogus/misleading
> information, and he then made a decision based on the bogus
> "facts" created/presented by DG[.]

*Id.* at Manning 1509-1510 (Defs. Ex. 9, ECF No. 49-10 at 16-17).  Finally, in his summary,

Manning concluded that as of 3/31/08, Gundlach had used Flannery to "fabricate a damning

story to use as 'evidence' to present to the [board of directors] as justification for the alleged

'cause'[.]"  (*Id.* at Manning 1511, ECF No. 49-10 at 18; Manning Dep. 10/28/10 at 129:9 to

130:19, Defs. Ex. 28, ECF No. 49-29 at 8-9.)

After his termination, Manning "applied for several thousand positions through a 'job

boards', mailings to executive recruiters, direct letters to potential employ[ers,] . . . and the

posting of his resume on various internet sites" as delineated in his Answers to Defendants'

Interrogatories, ¶21.  (Pl.'s Resp. CSMF ¶100, ECF No. 58 at 70 (citing Pl. Ex. 2, ECF No. 59-2

at 12-13).)  Manning claims that because of his termination by Ardex and Defendants' conduct

as outlined in paragraphs 1 through 33 of his Complaint, no one will hire him. (Defs. CSMF ¶90;

---

[11] "ME" refers to Mark Eslamlooy, CFO of Ardex worldwide.

Pl. Resp. CSFM ¶90.)   Although Manning had 15 to 16 interviews with potential employers (Manning Dep. 10/28/10 at 169:13-16, Pl. Ex. 5, ECF No. 59-5 at 7), he only had a couple of second interviews and neither progressed to a discussion of terms and conditions of a potential employment contract (*Id.* at 194-96, Defs. Ex. 28, ECF No. 49-29 at 11-13).

Thereafter, Manning filed suit against Ardex in federal court in the Eastern District of Pennsylvania over his termination for cause and Ardex's invocation of the non-compete clause in his Executive Agreement.[12]   During discovery in that case, Manning claims he learned for the first time of Holland's version of Angelo's voice mail message communicated to Flannery, Nevin and Gundlach, when Ardex produced the document Bates-stamped ARDEX 000336 in August of 2008.[13]   (Pl.'s Aff. ¶2, Pl. Ex. 1, ECF No. 59-1 at 2.)   Manning further maintains that he never saw any written communications between Flannery, Holland, Gundlach and/or Nevin until he received those documents during discovery in the *Ardex* litigation in August of 2008.[14] (*Id.* at ¶1.)

On July 17, 2009, Manning instituted the present action against Flannery, Holland and Boyden in the Eastern District of Pennsylvania, alleging various state common law claims including intentional interference with existing contractual and business relationships, intentional interference with prospective business relationships, defamation, breach of fiduciary duty, and negligence.   This instant litigation was subsequently transferred to this District on 2/08/10.   After

---

[12] The parties eventually reached a settlement in the *Ardex* litigation.

[13] The evidence cited by Defendants in support of their Reply CSMF ¶95 does not support their position that Manning was fully aware of Holland's version of the Angelo voice mail message to her.   (ECF No. 62 at 47.)

[14] Defendants admit that while Manning may not have seen the documents until August of 2008, he nonetheless was aware of the contents of the Flannery/Holland 3/6/08 Memo.   (Defs. Reply CSMF ¶94, ECF No. 62 at 45-46.)

the close of discovery, Defendants filed a Motion for Summary Judgment (ECF No. 49). The motion has been fully briefed and responded to, and thus, is ripe for disposition.

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting FED.R.CIV.P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.   <u>DISCUSSION</u>

Defendants move for summary judgment on several issues—(1) whether Plaintiff's defamation claim is barred by the one-year statute of limitations applicable to such claims; (2) whether the one-year statute of limitations for defamation claims also applies to Plaintiffs' claims for intentional interference with existing and prospective contractual/business

relationships and for negligence; and, if these claims are not time-barred, (3) whether Plaintiff has adduced evidence to establish prima facie elements of these claims and his claim for breach of fiduciary duty, or at least raise an issue of fact as to those elements.   The Court will address each argument in turn.

A. **Statute of Limitations**

1. **Defamation Claim**

In Pennsylvania, the statute of limitations for bringing defamation claims is one year.  42 Pa. Cons. Stat. Ann. § 5523(1) (West 1981).   Pursuant to the Judicial Code, the statute of limitations begins to run at the time the cause of action accrues.  *Fine v. Checcio,* 870 A.2d 850, 857 (Pa. 2005) (citing 42 Pa. Cons. Stat. Ann. §5502(a)).   The Pennsylvania Supreme Court has construed this to mean that the "statute of limitations begins to run as soon as the right to institute and maintain a suit arises."  *Id.* (citing *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.,* 468 A.2d 468, 471 (Pa. 1983)).   Generally, in a defamation action, the cause of action accrues at the time the alleged defamatory remark is uttered.  *Brown v. Davita Inc.,* Civ. A. No. 09-3892, 2011 WL 5523823, *2 (E.D.Pa. Nov. 14, 2011) (citing *Spain v. Vicente,* 461 A.2d 833, 837 (Pa. Super. Ct. 1983); *Smith v. IMG Worldwide, Inc.,* 437 F.Supp. 2d 297, 305-06 (E.D.Pa. 2006)).   "Mistake, misunderstanding, or lack of knowledge in themselves do not toll the running of the statute."  *Id.*

The discovery rule and the doctrine of fraudulent concealment provide two exceptions which act to toll the running of the limitations period.  *Id.* at 858.   In essence, the discovery rule has been applied in situations where the injured party is unable, despite the exercise of reasonable diligence, to know that he is injured and by what cause.  *Id.* (citing *Pocono Int'l,* 468

A.2d at 471).   In determining whether "reasonable diligence" was exercised, the supreme court

has set forth the following standard:

> [R]easonable diligence is not an absolute standard, but is what is
> expected from a party who has been given reason to inform
> himself of the facts upon which his right to recovery is premised.
> As we have stated: " '[T]here are [very] few facts which diligence
> cannot discover, but there must be some reason to awaken inquiry
> and direct diligence in the channel in which it would be successful.
> This is what is meant by reasonable diligence.' " *Crouse v.
> Cyclops Industries*, 560 Pa. 394, 745 A.2d 606, 611 (2000)
> (quoting *Deemer v. Weaver*, 324 Pa. 85, 187 A. 215, 217 (1936)
> (citation omitted)).  Put another way, "[t]he question in any given
> case is not, what did the plaintiff know of the injury done him?
> [B]ut, what might he have known, by the use of the means of
> information within his reach, with the vigilance the law requires of
> him?" *Scranton Gas & Water Co. v. Lackawanna Iron & Coal Co.*,
> 167 Pa. 136, 31 A. 484, 485 (1895). While reasonable diligence is
> an objective test, "[i]t is sufficiently flexible...to take into account
> the difference[s] between persons and their capacity to meet
> certain situations and the circumstances confronting them at the
> time in question." *Crouse*, 745 A.2d at 611 (quotation omitted).
> Under this test, a party's actions are evaluated to determine
> whether he exhibited "those qualities of attention, knowledge,
> intelligence and judgment which society requires of its members
> for the protection of their own interest and the interest of others."
> *Id.*

Thus, when the Court is faced with the argument that the discovery rule should be

applied to toll the running of the statute of limitations, it must address the ability of the injured

party, exercising reasonable diligence, to ascertain that he has been injured and by what cause.

*Id.* (citation omitted).   Although this question usually involves a factual issue for the jury to

decide, where reasonable minds would not differ in concluding that a party knew or should have

known of his injury and its cause upon the exercise of reasonable diligence, the Court may find

that the discovery rule does not apply as a matter of law.   *Id.* at 858-59 (citing *Pocono Int'l,* 468

A.2d 471) (other citations omitted).   The party seeking to invoke the discovery rule maintains

the burden of proving that despite the exercise of reasonable diligence, he was unable to discover his injury. *Gatling v. Eaton Corp.,* 807 A.2d 283, 289 (Pa. Super. Ct. 2002)(citing *Dalrymple v. Brown*, 701 A.2d 164, 167 (Pa. 1997)).

Of particular relevance to the case at bar, the *Fine* court further held that "[w]hen the discovery rule applies, the statute of limitations does not commence to run at the instant that the right to institute suit arises, i.e., when the injury occurs[, but r]ather, the statute is tolled, and does not begin to run until the injured party discovers or reasonably should discover that he has been injured and that his injury has been caused by another party's conduct." *Id.* at 859 (internal citations omitted). In so holding, the supreme court in *Fine* noted that several justices had taken divergent views in its decisions in *Saavedra* and *Baumgart* as to whether application of the discovery rule should be further restricted based on whether the statute of limitations period had expired prior to discovery of the injury and its cause. *Id.* (citing concurring and dissenting opinions in *Murphy v. Saavedra,* 746 A.2d 92, 93-95, 98-101 (Pa. 2000), and *Baumgart v. Keene Bldg. Prods. Corp.,* 666 A.2d 238, 239-45 (Pa. 1995)). The *Fine* court laid to rest these diverging views and held that "it is not relevant to the discovery rules application whether or not the prescribed period has expired; the discovery rule applies to toll the statute of limitations in any case where a party neither knows nor reasonably should have known of his injury and its cause *at the time his right to institute suit arises.*" *Id.* (emphasis added).[15]

In addition to the discovery rule, the doctrine of fraudulent concealment may also be invoked to toll the statute of limitations. Based on an estoppel theory, the doctrine of fraudulent

---

[15] Defendants rely on Judge Ambrose's opinion in *Bradley v. Conner,* Civ. A. No. 07-1347, 2007 WL 4241846, *4 (W.D.Pa. Nov. 29, 2007), to support their argument that because Plaintiff learned of the alleged defamatory statements within the statutory period—one year from his claimed damage (termination)—the discovery rule does not apply. Defendants reliance on *Bradley* is misplaced as the Pennsylvania Supreme Court in *Fine* clearly rejected this argument.

concealment "provides that the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." *Fine,* 870 A.2d at 860 (citation omitted); *see also Nesbitt v. Erie Coach Co.,* 204 A.2d 473, 475 (Pa. 1964) (citations omitted). The degree of fraud required is not strictly limited to intentional conduct, but rather, is viewed in the broadest sense to include unintentional deception. *Id.* Plaintiff bears the burden of demonstrating fraudulent concealment by "clear, precise, and convincing evidence." *Id.* (citing *Molineux v. Reed,* 532 A.2d 792, 794 (Pa. 1987)). The court may determine as a matter of law whether an estoppel results from established facts; however, the jury must decide whether the remarks that are alleged to constitute the fraud or concealment were made. *Id.* (citation omitted). The same reasonable diligence standard applies to determining whether the statute of limitations should be tolled based on the doctrine of fraudulent concealment. *Id.* at 861. Accordingly, where fraudulent concealment has been shown, the limitations period begins to run when the injured party knows or reasonably should know of his injury and its cause. *Id.*

Plaintiff relies on both of these exceptions to avoid application of the statute of limitations bar to his defamation claim. With regard to the discovery rule, the Court finds that Plaintiff has met his burden of showing that the discovery rule should be applied to his defamation claim. As a preliminary matter, the Court notes that Manning now makes clear, in his  opposition to summary judgment, that the alleged defamatory statements are limited to Holland's communication of Angelo's "don't tell Tom" voice mail to Flannery, and Holland and Flannery's communication of same to Gundlach and Nevin. *See* Pl.'s Mem. of Law Opp'n at 3, ECF No. 57 at 3. With this in mind, the Court turns to the evidence of record.

26

Plaintiff's entries on 3/7/08, 3/12/08 and 3/13/08 in his Memo/Timeline show that as of 3/31/08, he suspected and/or had reason to know that Defendants had made derogatory statements to Gundlach about him in order to provide Gundlach with a basis for terminating his Executive Agreement.[16]   However, Plaintiff's suspicions were based on oral third-party accounts of *opinions* expressed by Defendants, not actual misstatements of fact.  (Pl. Resp. CSMF ¶¶86-87, ECF No. 58 at 66-67.)   Moreover, although Plaintiff was aware of the contents of the Flannery/Holland 3/6/08 Memo, all of the parties here agree that none of the statements contained therein constitute defamation.  At best, Plaintiff's suspicions and/or knowledge as of 3/31/08 were sufficient to put him on notice of his injury and its cause vis a vis his claims for intentional interference with contractual/business relationships.  However, the undisputed evidence in the summary judgment record shows that neither Angelo nor Manning knew about the allegedly defamatory statement—"don't tell Tom"—until August of 2008, shortly before Angelo's deposition on 8/19/08.  In addition, none of the other evidence, i.e., oral accounts of the content of certain documents observed by Angelo and Plaintiff's former secretary which were communicated to Manning in March of 2008, are sufficient to put Manning on notice of a potential defamation claim based on the "don't tell Tom" statement.

Plaintiff undertook reasonable efforts to discover this information.  On 3/12/08, Plaintiff's counsel wrote to Ardex's counsel requesting information and documents regarding the events leading up to his termination.  Counsel for Ardex refused to provide the requested

---

[16] Manning maintains that a jury could conclude from his entry on 3/7/08 (Defs. Ex. 9 at Manning 1507) that he was informed of this information by a third party and never actually saw the document until it was produced in discovery in the *Ardex* litigation in August of 2008.  (Pl. Resp. CSMF ¶85, ECF No. 58 at 65.)   Manning's argument is unavailing as the discovery rule does not require that a plaintiff possess actual physical evidence in order to start the running of the statute of limitations.

documents because no basis existed under Pennsylvania law that required it to provide those documents.  After he instituted the *Ardex* litigation, Plaintiff obtained the previously requested documents through discovery in August of 2008 and learned of the "don't tell Tom" statement around that same time.  Therefore, a reasonable jury could not find that exercising reasonable diligence, Manning should have known of the defamatory statement in March of 2008.

Accordingly, the statute of limitations on Plaintiff's defamation claim did not begin to run until August of 2008 when Plaintiff first discovered Holland's "don't tell Tom" version of Angelo's voice mail.  Because Plaintiff instituted this action on July 17, 2009, within one year of first discovering the allegedly defamatory statement, his defamation claim is not time-barred. As the court has determined that the discovery rule applies, there is no need to reach Plaintiff's fraudulent concealment argument.

### 2.    Intentional Interference with Contractual and/or Business Relations

Next Defendants argue that the one year statute of limitations for defamation claims also applies to Plaintiff's intentional interference with contractual and/or business relationships claims because the intentional interference claims are predicated on the same alleged defamatory statements, citing, *inter alia*, *Evans v. Philadelphia Newspapers, Inc.,* 601 A.2d 330 (Pa. Super. Ct. 1991), in support.  Defendants argue that the gravamen of Plaintiff's Complaint is the alleged defamatory statements made by them which Plaintiff believes are the cause of his termination. However, Defendants submit that the "plethora of evidence" proffered in support of their summary judgment motion shows that Defendants' defamatory statements were not the cause of Plaintiff's termination.

In *Evans,* the superior court found that although a claim for tortious interference with contract may be a separate and distinct action from libel and slander, where the complaint alleges

28

that the underlying wrong is defamation by publication of a libelous report, and the injury claimed in each count springs from the act of publication, the plaintiff should not be allowed to circumvent the statute of limitations by merely labeling the claim as tortious interference when, in essence, it is one of defamation. *Id.* at 333. Consequently, the superior court in *Evans* looked to the gravamen of the action, not the label applied to it by plaintiffs, in determining whether to apply the one year statute of limitations to plaintiffs' tortious interference claim. *Id.* The superior court concluded that plaintiffs' "claim for tortious interference [wa]s based upon the alleged false and defamatory character of the communication complained of, and [was] indistinguishable from the claims of libel and slander," and therefore, the one year statute of limitations applied to both claims. *Id.* at 334-35.

The district court reached a similar conclusion in *Hurst v. Beck,* Civ. A. No. 91-2492, 1992 WL 396592 (E.D.Pa. Dec. 17, 1992). In doing so, the *Hurst* court relied on *Evans,* which "instructs that the trial court must make its own independent determination, as a matter of law, whether the separate cause of action for tortious interference is separate and unique from the defamatory statements or exists entirely because of the statements." *Id.* at *5 (citing *Evans,* 601 A.2d at 335). Thus, the district court found that if it determined that the tortious interference with contract claim owed its existence solely to the defamatory statements, then it was required to apply the one year statute of limitations. *Id.*

In *Hurst,* plaintiff sued her former employer, Pennsylvania Hospital, and two of its physicians, alleging that the defendants gave a potential employer references about her that were both defamatory and predicated upon information contained in her confidential personnel file, and based on these references, the potential employer declined to hire plaintiff. *Id.* at *1. Similar to Manning, the plaintiff in *Hurst* argued that the one year statute of limitations

29

applicable to defamation claims should not apply to her tortious interference with contracts claim because the actions of the defendant physicians, i.e., reading her personnel file, disclosing her CREOG resident's scores, and relating to the potential employer that some of the physicians did not like to work with plaintiff, constituted separate conduct beyond the defamation, and thus, constituted a separate tort. *Id.* at *5. As such, plaintiff maintained that the two year statute of limitations should be applied to the tortious interference claim. *Id.* The district court disagreed, finding that the described actions of defendant physicians arose out of the alleged defamatory statements. In so finding, the court reasoned that "[w]hile each of the foregoing actions might have had an impact on the plaintiff's business, the 'gravamen' of plaintiff's complaint is that the foregoing conduct was detrimental because of its defamatory character." *Id.* (citing *Evans*, 601 A.2d at 333).

By contrast, in *Rolite*, the district court applying Pennsylvania law held that because plaintiff's state claims were based primarily upon unfair competition as opposed to defamation, plaintiff was not claiming injury to its reputation, but rather, that the alleged misrepresentations regarding the nature of its product and that its process infringed on defendant's patent caused harm to its economic interests, and therefore, the one year statute of limitations for defamation claims did not apply to plaintiff's tortious interference claim. *Rolite, Inc. v. Wheelabrator Environmental Sys., Inc.,* 958 F.Supp. 992, 1011 (E.D.Pa. 1997). In such situations, the Pennsylvania courts have held that the one year statute of limitations for defamation claims does not apply to tortious interference claims.

In opposing the application of the one year statute of limitations to his intentional interference claims, Manning submits that *Evans* is distinguishable from the case at bar as his intentional interference claims are predicated upon opinions and statements other than the ones

30

offered in support of his defamation claim, to prove his intentional interference claims. Specifically, Plaintiff submits that his intentional interference claims are based on a course of conduct described in the Complaint, and as set forth in Defendants' CSMF ¶52 and Plaintiff's Responsive CSMF ¶52, as well as Plaintiff's Responsive CSMF ¶¶13, 29, 34, 36, 39, 45, 46, 48, 54-55, 59-60, 67, 69-70, 72-73, 76 and 78.  According to Plaintiff, this alleged conduct consisted of, *inter alia,* "the panoply of successful efforts by the [Defendants] to undermine the plaintiff and cause his firing by Ardex, L.P., by means of secret communications between [Defendants] and Gundlach/Nevin and the conveying of toxic and unfounded opinions which were, in turn, communicated by Gundlach to members of the Board of the German parent of Ardex, L.P., its American subsidiary."  Pl.'s Mem. of Law in Opp'n to Summ. J. ("Pl.'s Mem. in Opp'n") at 12, ECF No. 57 (citing Pl.'s Resp. CSMF ¶¶97-100 & Flannery/Holland communications referenced in Pl.'s Mem. in Opp'n).  Moreover, Manning points out that Defendants have expressly argued that the alleged statements attributed to them were not defamatory, and as such, the intentional interference claims cannot be duplicative of the defamation claims. (*Id.* at 12-13.)  Manning submits, therefore, that the two year statute of limitations set forth in 42 Cons. Stat. Ann. §5524(7) should be applied to his intentional interference claims.

Based upon the relevant authority and a review of the summary judgment record, the Court agrees with Plaintiff that the one year statute of limitations for defamation claims does not apply to his intentional interference claims.  With regard to his claim of intentional interference with existing contractual relationships (Count I), Plaintiff is alleging injury to economic interests by virtue of his loss of employment and the prospect of future employment with Ardex, LP. (Compl., ¶41.)  Moreover, Plaintiff's intentional interference claims are predicated upon a series of events and conduct involving various secret communications primarily between Defendants

and Gundlach and Nevin, wherein Defendants expressed opinions about Manning and his loyalty to Ardex allegedly in an attempt to undermine Manning with Gundlach and provide a basis for his termination. *See, e.g.,* 1/28/08 Flannery Email to Gundlach (Defs. Ex. 18, ECF No. 49-19); 2/18/08 Flannery/Gundlach & Gundlach/Holland Tel. Conf. (Compl. ¶29f); 2/18/08 Emails between Flannery & Gundlach (Defs. Ex. 31, ECF No. 49-32); 2/25/08 Tel. Conf. between Flannery & Nevin (Pl. Ex. 11, ECF No. 59-11 at 2 & Defs. Ex. 32, ECF No. 60-35 at 4; 3/3/08 Letter from Flannery to Gundlach (Defs. Ex. 34, ECF No. 49-35 at 2-7); 3/6/08 Flannery/Holland Memo (Defs. Ex. 35, ECF No. 49-36 at 4).

Based on the above, it is clear that Plaintiff's claim of intentional interference with existing contractual relations is predicated on the derogatory opinions communicated by Defendants to Gundlach and Nevin which allegedly interfered with Plaintiff's rights under his Executive Agreement with Ardex, thus resulting in economic harm to Plaintiff. As such, the Court finds that the one-year statute of limitations applied to defamation claims does not apply to the intentional interference claim asserted in Count I. Accordingly, Plaintiff's claim for intentional interference with existing contractual relationships was brought in a timely fashion, as Plaintiff filed his Complaint on July 17, 2009, which is within two years of when his cause of action accrued.

As to Plaintiff's claim of intentional interference with existing business relationships (Count II), Plaintiff alleges that Defendants' conduct interfered with his existing business relationships with various suppliers, customers, and distributors of Ardex LP, as well as others who dealt with Plaintiff in a business context. (Compl., ¶43.) Plaintiff further alleges that "[s]uch interference arose at least in relevant part from such third parties learning that the plaintiff had been discharged by Ardex, LP and their ascribing as the reason for said discharge a

conclusion that the plaintiff was either incompetent or dishonest." (*Id.*)  As it does not appear that this claim is predicated upon any allegedly defamatory statements, the Court finds that the one year statute of limitations applicable to defamation claims does not apply to Plaintiff's intentional interference with existing business relationships claim.  Therefore, this claim is also not time-barred.

Finally, with regard to Plaintiff's claim of intentional interference with prospective business relationships (Count III), Plaintiff alleges that as a result of Defendants' intentional conduct in, inter alia, conspiring to have Plaintiff fired for alleged disloyalty, deception and cause, Plaintiff was not hired either in the Eastern District of Pennsylvania or elsewhere. (Compl., ¶45.)  Moreover, Plaintiff alleges that Defendants knew such conduct would cause future employers to refrain from hiring him and prevent him from obtaining other employment. (*Id.*)  As with Count I, Plaintiff's intentional interference claim in Count III does not appear to be predicated upon any allegedly defamatory statements, but instead, allegedly arises from Defendants' communications to Gundlach and Nevin of their opinions about Plaintiff's loyalty to Ardex.  In addition, Plaintiff is alleging economic harm from lost employment opportunities with prospective employers as a consequence of Defendants' intentional interference.  As such, the Court finds that the one-year statute of limitations applied to defamation claims does not apply to the intentional interference claim brought in Count III.  Therefore, this claim is also not time-barred.

Accordingly, since none of Plaintiff's claims are time-barred, the Court turns to Defendants' arguments on the merits of Plaintiff's claims.

**B.**     <u>Whether The "Don't Tell Tom" Statement Is Defamatory</u>

Although this Court has concluded that Plaintiff's defamation claim was timely filed, that does not preclude the granting of summary judgment on other grounds. Defendants argue in the alternative that Plaintiff cannot establish a valid legal claim that the "don't tell Tom" statements were defamatory for two reasons:  (1) the statements are not capable of defamatory meaning; and, (2) the statements were privileged and Defendant did not abuse the privilege, but provided either truthful statements or honest advice and opinion, reasonably based on disclosed facts. (Defs. Mem. in Supp. Summ. J. at 13, ECF No. 50 at 13.)

In Pennsylvania, a communication will be considered defamatory "if, among other things, 'it ascribes to another conduct, character or a condition that would adversely affect that person's fitness for the proper conduct of their business, trade or profession.'" *Levenson v. Oxford Global Resources, Inc.,* Civ. A. No. 05-1639, 2007 WL 4370911, *5 (W.D.Pa. Dec. 11, 2007) (quoting *Pellegrino Food Prods. Co., Inc. v. The Valley Voice,* 875 A.2d 1161, 1164 (Pa. Super. Ct. 2005)); *Green v. Mizner,* 692 A.2d 169, 172 (Pa. Super. Ct. 1997) (a communication is defamatory "if it tends to blacken a person's reputation or expose him to public hatred, contempt, or ridicule, or injure him in his business or profession.") (citing *Livingston v. Murray,* 612 A.2d 443, 447 (Pa. Super. Ct. 1992)); *see also Thomas Merton Center v. Rockwell Int'l Corp.,* 442 A.2d 213, 215 (Pa. 1981) (a communication is defamatory "'if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'")  (quoting *Birl v. Phila. Elec. Co.,* 167 A.2d 472, 475 (Pa. 1960)) (other citation omitted).  "When communications tend to lower a person in the estimation of the community, deter third persons from associating with him, or adversely affect his fitness

for the proper conduct of his lawful business or profession, they are deemed defamatory." *Green,* 692 A.2d at 172 (citation omitted).

Initially, the court is charged with the responsibility of determining whether the challenged publication is capable of defamatory meaning. *Id.* (citations omitted); *Thomas Merten Center,* 441 A.2d at 215. In doing so, "the court 'must view the statement 'in context' with an eye toward 'the effect [the statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.'"" *Donaldson v. Informatica Corp.,* Civ. A. 08-605, 2009 WL 4348819, at *15 n. 10 (W.D.Pa. Nov. 30, 2009) (quoting *Remick v. Manfredy,* 238 F.3d 248, 261 (3d Cir. 2001) (quoting *Baker v. Lafayette College,* 532 A.2d 399, 402 (Pa.1987); citing *Green,* 692 A.2d at 172)). If the court concludes that the communication at issue is not capable of defamatory meaning, then no basis will exist for proceeding to trial. *Thomas Merten Center,* 441 A.2d at 215-16 (citing RESTATEMENT (SECOND) OF TORTS, §614(1) (1938)) (other citations omitted).

As noted above, in his brief in opposition to summary judgment, Manning now makes clear that the alleged defamatory statements are limited to Holland's and Flannery's communications of Angelo's "don't tell Tom" voice mail to Gundlach and Nevin, which was passed along to the Board of Directors in Germany. *See* Pl.'s Mem. in Opp'n at 3, ECF No. 57 at 3. Plaintiff argues that at the very least, these allegations "clearly were intended to injure him in his business or profession, deter the Ardex parent and Ardex LP from associating with him (i.e., by causing his firing) and went to the heart of his fitness for the proper conduct of his position as President of Ardex, LP." *Id.* at 20, ECF No. 57 at 20. As such, Plaintiff submits, a jury could find those communications to be defamatory. In addition, Plaintiff argues that an

issue of fact exists as to the falsity of the communications by Holland and Flannery, based on the conflicting testimony of Holland and Angelo.

Examining the "don't tell Tom" statement in context, and if indeed that statement is determined to be false (i.e., the jury believes Angelo), then Gundlach was given false information about Manning which a jury could find tarnished his business reputation as President and CEO of Ardex with Gundlach and the Board of Directors in Germany. Specifically, Gundlach testified that he was angry and disturbed by this information, and found Manning's conduct "absolutely inacceptable" and showed that he was once again disloyal to Gundlach. Gundlach further testified that he found Manning's use of his staff (Angelo) to convey the "don't tell Tom" message to be "highly reprehensible." (Defs. Ex. 31 at BOY 000038, ECF No. 49-32 at 3.) Moreover, Manning's handling of the VP Operations search was a factor that Gundlach considered in making the decision to terminate his contract. *See* Gundlach Memo 2/28/08 at 2-3, Defs. Ex. 5, ECF No. 49-6 at 3-4. Viewing this evidence in the light most favorable to Plaintiff, a reasonable jury could view the 2/12/08 communication and Gundlach's reaction thereto as a significant factor in Gundlach's decision to terminate Plaintiff. Under these circumstances, the Court finds that whether the "don't tell Tom" communication was capable of defamatory meaning is a question for the jury.

### *Privilege*

Defendants may nonetheless avoid liability for the alleged defamatory communications if they can show the communications were privileged. Pennsylvania recognizes two types of privilege—absolute and conditional, *Levenson,* 2007 WL 4370911, at *9, however, only the

conditional privilege applies to the case at bar.[17]   A conditional privilege is recognized "when the speaker and the recipient share a common interest in the subject matter and both are entitled to know about the information."   *Foster v. UPMC South Side Hosp.,* 2 A.3d 655, 664 (Pa. Super. Ct. 2010) (citing *Daywalt v. Montgomery Hosp.,* 573 A.2d 1116, 1118 (Pa. Super. Ct. 1990)). Moreover, for a conditional privilege to apply, the defendant must show that the communications were "'made on a proper occasion, from a proper motive, in a proper manner, and . . . based [ ] on reasonable cause.'"   *Levenson,* 2007 WL 4370911, at *9 (quoting *Moore v. Cobb-Nettleton,* 889 A.2d 1262, 1268 (Pa. Super. Ct. 2005)); *see also* 42 Pa. Cons. Stat. Ann. § 8343(b)(2) (West 2007) (defendant's burden to prove communications were privileged).

Once the defendant has established that a conditional privilege applies, the defamation claims will survive only if the plaintiff can show that the privilege was abused.  *Foster,* 2 A.3d at 665 (citing *Moore,* 889 A.2d at 1269); *see also* 42 Pa. Cons. Stat. Ann. §8343(a)(7) (plaintiff's burden to prove abuse of a conditional privilege).  As to what constitutes abuse of privilege, the superior court opined:

> Abuse of a conditional privilege is indicated when the publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given, or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, or included defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose.

*Moore,* 889 A.2d at 1269.

---

[17] "'Absolute privileges are granted by statute,' 'to statements made by participants in any stage of judicial or legislative proceedings,' 'to high public officials acting within the scope of their duties,' 'to employers issuing evaluations, warning letters or terminations,' 'or by consent.'"  *Levinson,* 2007 WL 4370911, at * 9 (quoting *Johnson v. Resources for Human Dev., Inc.,* 860 F.Supp. 218, 222 (E.D.Pa. 1994)).  None of the recognized categories of absolute privilege are implicated in the case at bar.

In the case at bar, Defendants argue that the "don't tell Tom" communication was privileged and a good faith honest belief of what Angelo stated. (Defs. Reply Mem. of Law at 3-4, ECF No. 61 at 3-4.)   Even though Defendants acknowledge that the truthfulness of this communication is disputed, Defendants still maintain that Holland's communication was a reasonable statement based on what Angelo said. (Defs. Supp. Mem. at 15, ECF No. 50 at 15.) Defendants further maintain that Holland was privileged to give this information to Gundlach, as Holland was providing information regarding the VP Operations search pursuant to Gundlach's request. (*Id.* at 16.)   Moreover, Defendants maintain it was their job to provide advice and opinions to Ardex executives, including Gundlach, as to the quality of the candidates who would eventually succeed Plaintiff as President and CEO and whether Plaintiff was selecting the best candidate for the position.

Much of Plaintiff's counterargument regarding privilege as a defense to defamation is combined with his argument regarding lack of privilege for purposes of his intention interference claims.   However, Plaintiff fails to address Defendants' argument that Holland and Flannery were privileged to give this information to Gundlach and Nevin, as it was done in furtherance of the ongoing search for VP Operations and pursuant to Gundlach's request for information about why the two external candidates could not be brought in for interviews while he was in Pittsburgh.   Focusing only on the narrowly identified communications which Plaintiff now claims constitute defamation,   the Court finds that the undisputed evidence shows that Holland and Flannery were privileged to communicate the "don't tell Tom" voice mail to Gundlach and Nevin.   Plaintiff has failed to point to any evidence in the record that would suggest otherwise and the Court could find none upon its own review of the record.   Clearly Holland and Flannery shared a common interest with Gundlach regarding the VP Operations search and therefore were

entitled to know about the communication, even if it was untruthful.  No reasonable jury would conclude otherwise.  Therefore, the Court finds that Defendants have met their burden of proving that the communication of the "don't tell Tom" statement was privileged.

Thus, the only question remaining is whether Plaintiff has adduced sufficient evidence to show that, or has at least raised a triable issue of fact as to whether, Defendants abused the privilege.  Defendants contend that Plaintiff has failed to meet his burden, as there is no evidence that Holland acted with malice towards Plaintiff or otherwise abused the privilege.  Specifically, Defendants argue in support that there is no evidence that Holland had any intention of getting Plaintiff fired by speaking with Gundlach when she communicated the "don't tell Tom" statement.    (Defs. Supp. Mem.  at 17; Defs. Reply Mem. at 4.)  According to Defendants, the evidence merely shows that Holland was aware of a problem with the search for VP Operations. (Defs. Supp. Mem. at 17.)

The thrust of Plaintiff's counterargument[18] is that because there is conflicting testimony between Angelo and Holland as to the content of the 2/12/08 voice mail, a jury must decide this issue.  Once the issue is before the jury, Plaintiff contends the jury could then find that Holland's communication was an untrue accounting of the Angelo voice mail and, based *solely* on this finding, the jury could also find that Holland intentionally or recklessly reported a false account

---

[18] In addition to this counterargument, Plaintiff raises several other arguments, but none of them go to the issue of abuse of privilege. For example, Plaintiff submits that the "don't tell Tom" communications materially contributed to his firing.  Notwithstanding there is evidence to the contrary in the record, this argument goes to damages, not Defendants' state of mind in publishing the statements.  Plaintiff also argues that Flannery's complicity in passing on the defamatory communications to Gundlach and Nevin is apparent from Flannery's 3/3/08 email to Nevin, in which he attached Holland's Timeline dated 3/3/08. (Defs. Ex. 33 at BOY 000052 & BOY 000045 – 47, ECF No. 49-34 at 2, 5-7.)  However, the referenced documents show only that Flannery provided information about the search process, as collected and memorialized by Holland, to Nevin, which Flannery described as "accurate" "given Stacey's capacity for attention to detail."  (*Id.* at BOY 000052.)   No malice or recklessness can be gleaned from these documents.

of her conversation with Angelo with the intent to harm Plaintiff.   Even if one assumes, for purposes of Plaintiff's argument, that a jury would find that Holland's accounting was untruthful, that finding alone does not prove or lead to the conclusion that Holland acted with malice or recklessly.   The question of whether a communication is false is based on entirely different facts from those determinative of whether the decision to publish the false statement was motivated by malice or recklessness. With regard to the latter element, the superior court has made clear that "reckless disregard of the truth" means that the "defendant must have made the false publication with a 'high degree of awareness of ... probable falsity,' or must have 'entertained serious doubts as to the truth of his publication....'"   *Skiff,* 991 A.2d 965 (quoting *Fitzpatrick v. Phila. Newspapers, Inc.*, 567 A.2d 684, 688 (1989)).   Thus, in addition to showing the communication was false, Plaintiff must show that the false communication was made intentionally or with reckless disregard for the truth.   Plaintiff's argument conflates the two elements and thereby avoids his burden of showing an abuse of privilege.

Moreover, Plaintiff has failed to point to any evidence to show that in deciding to communicate Angelo's voice mail to Gundlach and Nevin, Defendants acted with malice or reckless disregard for the truth.   Although Plaintiff argues that "abundant" facts exist which support the conclusion that the falsity of Defendants' statements proves Holland intentionally or recklessly reported a false accounting of her conversations with the intent to harm Plaintiff, *see* Defendants' CSMF ¶52 and Plaintiff's Responsive CSMF ¶ 52 as well as ¶¶13, 29, 34, 36, 39, 45-46, 48, 54-55, 59-60, 67, 69, 70, 72-73, 76 and 78, the so-called "abundant" facts are, in actuality, statements offered in support of Plaintiff's intentional interference claims and involve different actions and conduct from that underlying his defamation claims. Plaintiff again makes the fallacious argument that the falsity of Defendants' statements, as demonstrated through the

40

"abundant" facts, proves that Holland intentionally and recklessly reported a false accounting of her conversations with Angelo.  This argument fails for the same reason articulated above.

Finally, Defendants maintain that Plaintiff has also failed to show that Flannery acted with malice in communicating the "don't tell Tom" statement to Gundlach and Nevin.   In support, Defendants rely on *Skiff RE Business, Inc. v. Buckingham Ridgeview, LP,* 991 A.2d 956, 965 (Pa. Super. Ct. 2010)*,* for the proposition that failing to investigate the truth of an honestly or reasonably believed statement, without more, will not support a finding of malice.  (Defs. Reply Mem. at 4.)   The Court agrees with Defendants. The gist of Plaintiff's defamation claim against Flannery appears to be that he failed to confirm Holland's version of the voice mail message with Angelo and he was complicit in passing along the information to Gundlach and Nevin.  However, as the superior court held in *Skiff,* "failure to investigate, without more, will not support a finding of actual malice, nor will ill will or a desire to increase profits." 991 A.2d at 965 (quoting *Fitzpatrick v. Phila. Newspapers, Inc.*, 567 A.2d 684, 688 (Pa. Super. Ct. 1989)).  As Plaintiff offers no other evidence to raise an issue of fact as to whether Flannery abused a conditional privilege,[19] Plaintiff's defamation claim against Flannery must fail.

Accordingly, the Court concludes that no reasonable jury could find, based on the record evidence, that Defendants abused a conditional privilege.  Therefore, since Defendants have met their burden of proving a conditional privilege, the Court finds that Defendants are entitled to summary judgment on Plaintiff's defamation claims in Counts IV and V.

### C.   Intentional Interference with Existing Contractual/Business Relationships

In Pennsylvania, the Pennsylvania Supreme Court has adopted Section 766 of the RESTATEMENT (SECOND) OF TORTS, with regard to the tort of intentional interference with

---

[19] *See* Note 18, *supra.*

41

existing contractual relations.  *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1183 (Pa. 1978); *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466 (Pa. 1979).   Section 766 provides:  "One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract."  RESTATEMENT (SECOND) OF TORTS § 766 (1979).  Thus, the requisite elements of a cause of action for intentional interference with existing contractual relationships include:

> (1) the existence of a contractual relationship between the complainant and a third party;
>
> (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship;
>
> (3) the absence of privilege or justification on the part of the defendant; and
>
> (4) the occasioning of actual damage as a result of defendant's conduct.

*Foster,* 2 A.3d at 665-66 (citation omitted); *CGB Occupational Therapy, Inc. v. RHA Health Serv., Inc.,* 357 F.3d 375, 384 (3d Cir. 2004) (citations omitted).

The parties' focus here is on the third element—the absence of privilege or justification. This element requires proof that the defendant's actions were improper under the circumstances presented.  *Foster,* 2 A.3d at 666; *Walnut Street Assocs. v. Brokerage Concepts, Inc.,* 982 A.2d 94, 98 (Pa. Super. Ct. 2009), *aff'd* 20 A.3d 468 (Pa. 2011). Generally, whether a defendant's conduct is improper for purposes of an intentional interference claim is determined by considering the factors listed Section 767 of the RESTATEMENT (SECOND) OF TORTS:

> (a) the nature of the actor's conduct;

(b)  the actor's motive;

(c)  the interests of the other with which the actor's conduct interferes;

(d)  the interests sought to be advanced by the actor;

(e)  the social interests in protecting the freedom of action of the actor and the contractual interests of the other;

(f)  the proximity or remoteness of the actor's conduct to interference, and

(g)  the relations between the parties.

*Walnut Street,* 982 A.2d at 98 (citing RESTATEMENT (SECOND) OF TORTS §767 (1979)); *see also*

*Skiff,* 991 A.2d at 966 (quoting *Strickland v. Univ. of Scranton,* 700 A.2d 979, 985 (Pa. Super.

Ct. 1997)) (internal citation omitted).  As the superior court observed in *Walnut Street,*

"[c]omment b to section 767 makes clear that under certain circumstances, 'the conduct should

be permitted without liability, despite its effect of harm to another,' and thus the decision

'depends upon a judgment and choice of values in each situation.'"  *Walnut Street,* 982 A.2d at

98 (quoting RESTATEMENT (SECOND) OF TORTS § 767 cmt. b (1979)).

The RESTATEMENT also sets forth specific circumstances in which interference with

contractual relationships is not improper and one such circumstance which has relevance to the

case at bar, is set forth in Section 772:

One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person

(a) truthful information, or

(b) honest advice within the scope of a request for the advice.

43

*Walnut Street,* 982 A.2d at 98-99 (quoting Restatement (Second) of Torts §772 (1979)).   As to

subsection 772(a) truthful information, comment b explains:

> There is of course no liability for interference with a contract or
> with a prospective contractual relation on the part of one who
> merely gives truthful information to another. The interference in
> this instance is clearly not improper. This is true even though the
> facts are marshaled in such a way that they speak for themselves
> and the person to whom the information is given immediately
> recognizes them as a reason for breaking his contract or refusing to
> deal with another. It is also true whether or not the information is
> requested.

RESTATEMENT (SECOND) OF TORTS § 772 cmt. b (1979).   Section 772(a) was recently adopted as

the law in Pennsylvania by the Pennsylvania Supreme Court in affirming the superior court's

decision in *Walnut Street.*   20 A.3d 468, 478 (Pa. 2011).

With regard to Section 772(b), honest advice, comment c provides in relevant part:

> The rule as to honest advice applies to protect the public and
> private interests in freedom of communication and friendly
> intercourse. In some instances the rule protects the public and
> private interests in certain professions or businesses. Thus the
> lawyer, the doctor, the clergyman, the banker, the investment,
> marriage or other counselor, and the efficiency expert need this
> protection for the performance of their tasks. But the rule protects
> the amateur as well as the professional adviser. The only
> requirements for its existence are (1) that advice be requested, (2)
> that the advice given be within the scope of the request and (3) that
> the advice be honest. If these conditions are present, it is
> immaterial that the actor also profits by the advice or that he
> dislikes the third person and takes pleasure in the harm caused to
> him by the advice. If one or more of the three stated conditions are
> lacking, the rule stated in this Section does not apply. . . .

RESTATEMENT (SECOND) OF TORTS § 772 cmt. c (1979).   Section 772(b) has also been adopted

by the Pennsylvania Supreme Court. *Walnut Street,* 982 A.2d at 100 & n.5 (citing *Menefee v.*

*Columbia Broadcasting Sys.*, 329 A.2d 216, 221 (Pa. 1974)).

As in *Walnut Street,* the Defendants' argument in the case at bar is focused on the special circumstances raised in Section 772 of the RESTATEMENT. Defendants submit that all of their statements were privileged, and they did not abuse that privilege as they provided truthful statements or honest advice and opinion, reasonably based on disclosed facts. In addition to relying on *Walnut Street,* Defendants cite *Skiff,* 991 A.2d at 966, for the proposition that all a defendant needs is a "good faith belief" in the likely truth of his statement or action, even if it turned out to be incorrect, or the defendant had his own selfish motive. (Defs. Mem. of Law in Supp. of Summ. J. at 12, ECF No. 50 at 12.)

In *Walnut Street,* the parties did not dispute the truthfulness of the statements and therefore the supreme court determined that the defendant was entitled to judgment at a matter of law as to the intentional interference claims based on Section 772(a) of the Restatement. In the case at bar, Plaintiff disputes the truthfulness of the statements, but in reality his challenges are to the intent of Defendants. Indeed, in his opposing memorandum, Plaintiff relies on language in *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173 (3d Cir. 1997), suggesting that to overcome a privilege defense, it is sufficient to show that defendant's conduct was improper. Plaintiff submits that the record contains evidence of Defendants' improper intent, and points to Defendants' CSMF ¶52 and Plaintiff's Responsive CSMF ¶ 52 as well as ¶¶13, 29, 34, 36, 39, 45-46, 48, 54-55, 59-60, 67, 69, 70, 72-73, 76 and 78. Plaintiff's reliance on *Kachmar* is misplaced as the court of appeals analyzed the privilege defense under the general factors set forth in Section 767 not Section 772, since Section 772 had not yet been adopted by the Pennsylvania Supreme Court.

Plaintiff further posits that although Defendants contend that their opinions were merely "honest advice," a jury could certainly determine that the advice was, in fact, not honest as

45

illustrated, inter alia, by Gundlach's inquiry to Flannery as to whether Gundlach could count on Flannery's support in Gundlach's effort to convince the Board of Directors in Germany that Manning should be fired.  Pl.'s Mem. of Law in Opp'n at 18, ECF No. 57 at 18 (citing Defs. Ex. 31 at BOY 000038).   According to Plaintiff, this is but one of several instances and circumstances from which a jury could infer that Defendants had a self-serving intent motivated by their desire to cultivate additional business from Ardex entities by means of pleasing Gundlach.  *Id.*   This argument too must fail for several reasons. First, the Court agrees with Defendants that Plaintiff's reasoning stretches the meaning and intent behind the parties statements to absurd proportions.  Plaintiff's contention that Gundlach's request for Flannery's support meant that Flannery was supposed to lie is not a reasonable interpretation, but rather an unfair and forced construction of Gundlach's request, one that no reasonable jury could make. Second, the Defendants' improper intent is not relevant to determining whether Section 772 applies. Even though the advice given may have been self-serving, so long as it is truthfully and honestly given, the interference will be deemed proper. *Skiff*, 991 A.2d at 965 (holding that ill will or a desire to increase profits do not constitute malice with regard to abuse of privilege in defamation claim) (citation omitted). The Pennsylvania Supreme Court rejected a similar argument in *Walnut Street,* opining that when the special circumstances delineated in Section 772 exist, i.e., truthful information and/or honest advice, the intentional interference claim is to be analyzed under Section 772 of the Restatement as opposed to the more general factors set forth in Section 767.  *Walnut Street,* 20 A.3d at 478.

Plaintiff counters that Defendants' reliance on *Skiff* is misplaced. Plaintiff submits that a fair reading of *Skiff* does not support the proposition, advanced by Defendants that tortious interference claims fail if there is a "good faith belief" in the likely truth of their statement or

action, even if it turned out to be incorrect.  Rather, Plaintiff submits, *Skiff* relies on Section 767 of the RESTATEMENT (SECOND) OF TORTS which weighs seven different factors to determine whether certain conduct is improper with regard to an intentional interference claim. While Plaintiff is correct that the court in *Skiff* applied Section 767 in analyzing whether the defendant's conduct was improper, the court concluded that defendant's interference (i.e., assertion of a lien on one of the properties) was justified because it found defendants acted in good faith and with proper means.  991 A.2d at 966.  In any event, *Skiff* was decided before the Pennsylvania Supreme Court adopted Section 772 of the RESTATEMENT in *Walnut Street,* and thus, this Court is not bound to apply the more general factors listed in Section 767.

In addition, Plaintiff argues that the "defense of privilege depends upon the jury accepting the self-serving, good faith claims of the defendants."  Pl.'s Sur Reply at 4, ECF No. 68 at 4.  Because issues of fact exist as to these claims, Plaintiff contends that summary judgment is not appropriate.  Again, Plaintiff's argument misses the mark. On summary judgment, the test is whether Plaintiff has come forward with evidence that would be admissible at trial to raise a genuine issue of material fact as to whether Defendants' opinions and advice to Gundlach were not honest or truthful. Plaintiff has failed to meet this burden.

Here the record evidence clearly establishes that the advice Defendants gave to Gundlach and Nevin was done at the request of Ardex and pursuant to their agreement regarding the search for a VP Operations.  The record also establishes that advice given was within the scope of the search for a VP Operations executive, and the advice was honest.  Therefore, the Court finds that no reasonable jury could conclude that Defendants' interference was not justified.

As it appears from the record evidence there are no material issues of fact with regard to whether the advice and opinions given by Holland and Flannery to Gundlach and were honest,

the Court finds that Defendants are entitled to summary judgment on Plaintiff's claims of intentional interference with existing contractual/business relationships (Counts I and II).

### D.     **Intentional Interference with Propective Contractual/Business Relationships**

To maintain a cause of action for intentional interference with prospective contractual relations, a plaintiff must prove the following elements:

> (1) a prospective contractual relation;
>
> (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring;
>
> (3) the absence of privilege or justification on the part of the defendant; and
>
> (4) the occasioning of actual damage resulting from the defendant's conduct.

*Thompson Coal Co. v. Pike Coal Co.,* 412 A.2d 466, 471 (Pa. 1979) (citing *Glenn,* 272 A.2d at 898). The supreme court further explained the elements of this tort: "'the actor must act (1) for the purpose of causing this specific type of harm to the plaintiff, (2) such act must be unprivileged, and (3) the harm must actually result.'" *Id.* at 471 n. 7 (quoting *Glenn,* 272 A.2d at 898). Although the term, "prospective contractual relation" is somewhat elusive, the supreme court has provided the following working definition:

> . . . anything that is prospective in nature is necessarily uncertain. We are not here dealing with certainties, but with reasonable likelihood or probability. This must be something more than a mere hope or the innate optimism of the salesman. As the Superior Court of New Jersey has put it, " * * * the rule to be applied * * * is that the broker may recover when the jury is satisfied that but for the wrongful acts of the defendant it is reasonable probable that the plaintiff would have effected the sale of the property and received a commission." *Myers v. Arcadio, Inc.,* 73 N.J.Super. 493, 497, 180 A.2d 329, 331 (1962). This is an objective standard which of course must be supplied by adequate proof. (footnote omitted).

*Glenn,* 272 A.2d at 898-99.

The court of appeals for this circuit has interpreted Pennsylvania law to require a plaintiff to show "'an objectively reasonable probability that a contract will come into existence.'" *Binns v. Flaster Greenberg, P.C.,* 480 F.Supp. 2d 773, 780 (E.D.Pa. 2007) (quoting *Kachmar,* 109 F.3d at 184) (footnote omitted). "This 'reasonable probability' may result from an unenforceable express agreement, an offer, or the parties' current dealings, but not merely from prior dealings or an existing business relationship between the parties." *Id.* at 780-81 (citation omitted). For example, courts have found the existence of a prospective business relationship when the prospective employer expressed his desire to hire the plaintiff and would have hired him but for the deliberate intervention of plaintiff's former employer. *Yaindl v. Ingersoll-Rand Co. Std. Pump-Aldrich Div.,* 422 A.2d 611, 622 (Pa. Super. Ct. 1980), *abrogation on other grounds recognized in Yetter v. Ward Trucking Corp.,* 585 A.2d 1022 (Pa. Super. Ct. 1991). *Cf. Moore v. United Int'l Investigative Services, Inc.,* 209 F.Supp. 2d 611, 619-20 (E.D.Va. 2002) (a prospective employer's inquiry as to the reasons for the plaintiff's termination from his prior employment did not establish an expectancy of an business relationship where there was no evidence to suggest that the prospective employer expected or intended to offer plaintiff a job).

In the case at bar, Defendants submit that Plaintiff has failed to adduce any evidence of the first element—the existence of a prospective contractual relation. In particular, Defendants submit that the record does not contain any evidence that Defendants disclosed information to prospective employers, or that Plaintiff obtained an offer, oral agreement or had actual current dealings for employment beyond preliminary discussions and interviews for positions. The Court agrees.

49

The evidence of record shows that Plaintiff had 15 or 16 initial interviews and only two second interviews, but neither led to discussions of terms and conditions of employment. This evidence suggests merely a hope that a contract will occur, rather than a reasonable likelihood or probability that an employment contract will come into existence. Nor does the Court find that there was a reasonable likelihood or probability that Plaintiff's Executive Agreement with Ardex would have been extended at the end of its term on 12/31/09, but for Defendants' intentional interference. The fact that Plaintiff had prior dealings with Ardex and/or an existing business relationship does not, without more, establish a "reasonable probability." *Yaindl,* 422 A.2d at 622. In addition, even though the record evidence shows that Manning had achieved some success at Ardex, Gundlach had several issues with Manning besides the handling of the VP Operations search, as testified to by Gundlach on 11/17/08 and memorialized in his Memo to the Board of Directors dated 2/28/08, e.g., relocation issue, renegotiation of his bonus, inability to adapt to German culture, dispute over South American market, inappropriate behavior towards CFO. Also, Gundlach testified that he alone made the decision to terminate Plaintiff. (Gundlach Dep. 11/17/08 at 78:6-17, Defs. Ex. 10, ECF No. 49-11 at 11.) Given the existence of these other factors, no reasonable jury could find that Defendants' alleged interference was the "but for" cause of any lost prospective business relationships.

Plaintiff argues, nonetheless, that he would be able to place evidence before the jury regarding his past successes as an executive, as well as the great success he attained as President of Ardex, and therefore, he would be able to meet the standard set forth in *Thompson Coal* that but for the wrongful acts of Defendants, the jury could conclude that it is reasonably probably that he would have obtained executive employment or been rehired by Ardex at the end of his contract. Notwithstanding the fact that evidence of his past successes as an executive does not

appear in the summary judgment record, such evidence, if it actually exists, would not establish the *existence* of a prospective business relationship in the first instance.   Nor does the fact that Plaintiff achieved success at Ardex establish that there was a reasonable probability that his contract would have been extended for the reasons delineated above.   Moreover, Plaintiff has not and cannot point to any evidence in the record that shows that Defendants disclosed any information about Plaintiff to prospective employers.   While Defendants actions may have played some part in influencing Gundlach's decision to terminate Plaintiff's Executive Agreement with Ardex, it is pure speculation to argue that Defendants did so with the intent of interfering with prospective business/employment relationships which were not even contemplated or pursued at the time of Defendants' actions, i.e., September of 2007 through early March of 2008.

Plaintiff also relies on *Kachmar* for the proposition that the indefinite nature of the prospective contractual relation should not defeat his claim.   However, his reliance on *Kachmar* is misplaced.   In that case, the court of appeals was reviewing the adequacy of the allegations to determine whether a claim for interference with prospective contractual relations survived a motion to dismiss. In that case, the plaintiff alleged that during discussions with the prospective employer, she learned that her former employer informed the prospective employer that she had hired an attorney and was filing a discrimination suit against her former employer.  *Id.* at 184-85. The court of appeals found that Plaintiff's allegations suggested that the interaction between plaintiff and the prospective employer passed beyond the preliminary stage, and therefore,  were sufficient to withstand a motion to dismiss.   However, the court of appeals opined that had this matter been raised at the summary judgment stage, the plaintiff would have been required to

produce evidence from sources available to her to show that her contacts had reached the reasonable likelihood or probability stage.  *Id.* at 185.

Plaintiff's other arguments are equally unavailing.  First, Manning posits that the series of events described above caused him to file a lawsuit against Ardex which, in turn, caused the details of his termination to be posted on the Internet for the whole world to see.  That, when combined with being fired for cause and suing his employer "may well allow a jury to conclude that [he] became a *persona non grata* with respect to prospective employers of executives." (Pl.'s Mem. in Opp'n at 23, ECF No. 57 at 23.)  That may very well be, but that does not explain or support the establishment of the first element of his claim—the existence of a prospective contractual relationship.[20]   Nor does it account for the fact that Plaintiff, not Defendants, published this information on the Internet by filing suit.  Second, Plaintiff attempts to avoid summary judgment by arguing that he intends to produce an expert who will opine that he was disabled from obtaining executive employment from third parties which he would have obtained but for the circumstances of his being fired.  This is pure speculation on Plaintiff's part and again fails to point to evidence in the record to support the existence of a reasonably probable prospective contractual relationship.

Accordingly, the Court concludes that no reasonable jury could find that a reasonable likelihood or probability of prospective employment existed based on the evidence of record. Therefore, Defendants are entitled to summary judgment on the claim of intentional interference with prospective contractual/business relationships.

---

[20] To the extent Plaintiff may be suggesting that such evidence is relevant to establish improper intent, the resulting unfavorable publicity from instituting a cause of action does not create a material issue of fact as to Defendants' intent to interfere with any potential contractual relationships being pursued by Plaintiff. *Cf. Strickland v. Univ. of Scranton,* 700 A.2d 979, 985-86 (Pa. Super. Ct. 1997).

E.    **Breach of Fiduciary Duty**

Defendants also seek summary judgment on Plaintiff's claim for breach of fiduciary duty. To establish a breach of fiduciary duty claim, a plaintiff must show:  "(1) the existence of a confidential relationship; (2) the defendant's failure to act in good faith and solely for the benefit of the plaintiff with respect to matters within the scope of the confidential or fiduciary relationship; and (3) an injury to the plaintiff proximately caused by the defendant's failure to act." *SieMatic Mobelwerke GmbH & Co. KG v. SieMatic Corp.,* No. 06-CV-5165, 2009 WL 2526436, at *4 (E.D.Pa. Aug. 12, 2009) (citing *Baker v. Family Credit Counseling Corp.*, 440 F.Supp.2d 392, 414–15 (E.D.Pa.2006)).   With regard to the element of a "confidential relationship," the district court explained:

> A fiduciary duty exists when there is a "special relationship," which is one "involving confidentiality, the repose of special trust or fiduciary responsibilities." *eToll, Inc., v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 22 (Pa.Super.2002). A confidential relationship "generally involves a situation where by virtue of the respective strength and weakness of the parties, one has the power to take advantage of or exercise undue influence over the other." Id. In the business context, a confidential relationship is formed "only if one party surrenders substantial control over some portion of his affairs to the other." *In re Scott's Estate*, 455 Pa. 429, 316 A.2d 883, 886 (Pa.1974). A business relationship between two parties to a commercial contract dealing at arms length does not create a "special relationship" under Pennsylvania law. *Freedom Properties, L.P. v. Lansdale Warehouse Co. Inc.*, No. 06-5469, 2007 WL 2254422, at * 6 (E.D.Pa. Aug.2, 2007).

*Id.*

In a business context, the taking and receiving of business advice does not generally give rise to a fiduciary relationship.  *Id.* at 5 (citing *Basille v. H & R Block, Inc.,* 777 A.2d 95, 102 (Pa. Super. Ct. 2001) ("recognizing that giving business advice may engender confidential relations *only* where the advisor represents himself to be an expert and the receiver 'invest[s]

such a level of trust that they seek no other counsel'"); *eToll*, 811 A.2d at 23 ("holding no fiduciary duty created by a commercial contract for professional services, even where one party relies on the other party's skill or expertise")).  Relying on *Basile* and *eToll,* the district court in *SieMatic* rejected the American company's argument that a confidential relationship existed between it and a related German company because the American company felt obligated to follow the advice of its German affiliate in light of the American company's weaker financial position.  *Id.*  The court found no evidence that the German company purported to be an expert on the American company's business affairs or that the American company sought the counsel of the German company to the exclusion of all others.  *Id.*

In the case at bar, Defendants argue that the evidence shows that a confidential relationship did not exist between Boyden and Manning personally.  In support, Defendants point to the fact that Boyden's contract was signed by Manning in his capacity as President and CEO of Ardex, not in his individual capacity, and to their testimony that they believed that their clients were Ardex the company, and its shareholders.  (Holland Dep. 8/26-27/08 at 79:9 – 80:19, Defs. Ex. 13, ECF No. 49-14 at 8-9; Flannery Dep. 8/27/08 at 142:12-22, Defs. Ex. 4, ECF No. 49-5 at 13.)  In addition, Defendants maintain that there is no evidence in the record which suggests that Manning surrendered substantial control over his affairs or relied on Boyden's trusted advice over his own opinions.  Indeed, the evidence actually shows that Plaintiff refused Boyden's advice and opinion regarding the external candidates.

Plaintiff counters that a jury may conclude that he was dependent upon the Defendants to provide him as well as Ardex with accurate and full disclosures of their activities regarding the VP Operations search.  Plaintiff submits full disclosure by Defendants to him of their search activities can be implied from (1) the address of the engagement letter, to wit:  "Personal and

Confidential, Mr. Steve Manning – President and CEO," and (2) Defendants promise in that letter that "[d]uring the course of the assignment, we will maintain regular contact with you by e-mail or phone at a mutually agreeable interval[.]"  (Pl.'s Mem. in Opp'n at 24, ECF No. 57 at 24.)    Instead, Plaintiff maintains, his trust was abused by the "ex parte and vicious" communications initiated by Defendants, beginning with Flannery's 2/25/07 Letter to Gundlach (Defs. Ex. 14).  (Pl.'s Mem. in Opp'n at 24-25.)

The Court agrees with Defendants.  No reasonable jury could find that a confidential relationship existed between Boyden and Manning personally.  It is clear that Boyden's contract was with Ardex, as Boyden was asked to conduct an executive search for the position of VP Operations *at Ardex*.  Nothing in the engagement letter suggests that Boyden's responsibilities and obligations thereunder were owed to Manning personally.  Plaintiff submits that because the engagement letter did not mention any other person or entity, that Manning was the sole intended beneficiary of the engagement letter.  Plaintiff cites no legal authority to support his position. Clearly the letter was directed to Manning because he was the President and CEO of Ardex, and as such, had the authority to enter into contracts on behalf of the company.  Nothing in the engagement letter suggests that Boyden was performing services that were intended to benefit Manning individually.  To suggest otherwise defies logic.

Accordingly, because no reasonable jury could find that a confidential relationship existed between Boyden and Manning, the Court finds that summary judgment should be granted as to Plaintiff's claim for breach of fiduciary duty.

**F.    Negligence**

Finally, Defendants seek summary judgment on Plaintiff's negligence claim on several grounds.  First, Defendants submit that because the acts underlying his negligence claim rest on

allegations of defamation, his negligence claim should be subject to the one year statute of limitations for defamation claims and thus is time-barred.  This argument is quickly disposed of. In light of this Court's ruling above on the application of the discovery rule, Plaintiff's negligence claim is not time-barred regardless of whether the one year statute of limitations applicable to defamation claims, or the two year statute of limitations applicable to tort claims, is applied to Plaintiff's negligence claim.

Second, Defendants posit that Plaintiff's negligence claim is flawed because there is no such tort as negligent interference with a contract.  Plaintiff counters that Defendants misapprehend his position—his negligence claim is not predicated upon a tort of negligent interference with contract, but rather, on Section 302A of the RESTATEMENT (SECOND) OF TORTS (1965), which states:  "An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the negligent or reckless conduct of the other or a third party."  Based on Section 302A, Plaintiff posits that a jury may find that Flannery, in failing to determine whether Holland was accurate in her recitations to him concerning the Angelo discussions and voice mail, was negligent.  Plaintiff goes on to argue that if the jury finds Flannery negligent, then this negligence may in turn be found by the jury to involve an unreasonable risk of harm to Manning (i.e., his being fired) resulting from Defendants' communications with Gundlach and Nevin.

Plaintiff's argument is unavailing on two fronts. First, Plaintiff fails to provide any legal analysis to support his position.  Indeed, he provides no argument regarding how his only cited

case, *Suchomajcz v. Hummel Chemical Co.,* 524 F.2d 19, 24-25 (3d Cir. 1975),[21] supports his position, nor does he identify the proposition for which it is cited.   Moreover, Plaintiff's argument is illogical as it puts the proverbial cart before the horse.   The jury would have to find that an unreasonable risk of harm exists, among other things, before it could conclude that Defendants' conduct was negligent.   But the jury does not get to decide that issue unless Plaintiff can come forward with evidence to show that a question of fact exists as to whether Defendants' conduct created an unreasonable risk of harm.

Here Plaintiff merely proffers Flannery's failure to determine whether Holland was accurate in her recitation of Angelo's voice mail message as evidence of an unreasonable risk of harm.   However, Plaintiff fails to identify evidence in the record to suggest that Flannery had any reason to suspect that Holland's version of the Angelo voice mail may have been untrue at the time it was rendered.[22]   Moreover, both Gundlach and Nevin questioned Holland about her conversations with Angelo, including the voice mail message, and her responses were consistent. In addition, Flannery spoke confidently about the accuracy of Holland's reporting of the

---

[21] At the pinpoint cites provided, the court of appeals discusses the requirements for negligence under Section 302(b) of the RESTATEMENT, including that the risk of harm be unreasonable before an act may be found negligent, and the act of the third party be foreseeable. *Schomajcz,* 524 F.2d at 24-25.

[22] Plaintiff submits that Flannery conceded that in certain respects he knew that Holland may have misunderstood Angelo's statement. Pl.'s Sur-Reply Mem. at  (citing his Responsive CSMF ¶76, ECF No. 58 at 54-58).  However a review of the cited evidence belies Plaintiff's argument.  Flannery is commenting on the exchange between Angelo and Holland where Angelo asks, "an interview was not possible is it?" and Gundlach's interpretation of the statement as being a"clear interference."  The issue was whether Holland conveyed to Gundlach her response to Angelo's question, which explained that calling the outside candidates back in was possible unless there was no possibility that Ardex would make them an offer.  Flannery attempted to explain Holland's failure to elaborate on Angelo's  comment with Gundlach by stating that Holland may have misconstrued Angelo's comment. *See* ECF No. 58 at 54. Contrary to Plaintiff's assertion in his Responsive CSMF ¶76 at page 58, Flannery's comment about this *one* aspect of the several conversations between Holland and Angelo does not demonstrate or raise an inference that he had reservations about the accuracy of Holland's recounting to him of her conversations with Angelo.  Nor does it provide support for Plaintiff's argument that Flannery falsely assured Nevin that "given Stacey's capacity for attention to detail, I can assure you that the information is accurate." Pl.'s Resp. CSMF ¶76 at 58, ECF No. 58 at 58.

information in her timeline, stating that "[g]iven Stacey's capacity for attention to detail, I can assure you that the information is accurate." (Defs. Ex. 33 at BOY 000052, ECF No. 49-34 at 2.) Thus, without any evidence to suggest that Holland misstated the content of her conversations with Angelo, a reasonable jury could not find that Flannery created an unreasonable risk of harm in failing to determine whether Holland's statements were accurate.

Finally, in his sur-reply brief, Plaintiff raises a new theory for his negligence claim, which is predicated on Boyden's alleged failure to have internal controls or procedures in place which would have attempted to determine whether Holland's version of her conversation with Angelo were accurate.   Plaintiff posits that it would have been a simple matter for Flannery to have called Angelo and confirmed with her that she did in fact make the statement attributed to her by Holland. (Pl.'s Sur-Reply Mem. at 5, ECF No. 68 at 5.)  This argument too is flawed. Notwithstanding the fact that Plaintiff fails to cite to any evidence in the record to support his contention that Boyden failed to have adequate internal controls in place, Plaintiff fails to provide any legal authority or analysis showing that such internal controls should have been in place in the first instance.  In addition, Plaintiff ignores the fact that since neither Angelo nor Manning worked for or reported to Flannery, it would not have been up to Flannery to question Angelo or Manning about the "don't' tell Tom" voice mail.   The person with that authority, Gundlach, determined that it was not appropriate or necessary to question Angelo.

In further support of his new theory, Plaintiff now argues that despite Nevin's grilling of Holland, that does not excuse Holland from any negligence in her misreporting of the Angelo conversation.   This argument is completely undeveloped and lacking in any legal or factual support.  As such, the Court is not required to consider it.  *Massie v. U.S. Dep't of Housing & Urban Dev.*, Civ. A. No. 06-1004, 2007 WL 184827, *3 n. 5 (W.D.Pa. Jan. 19, 2007), *vacated in*

*part on other grounds on reconsideration*, 2007 WL 674597 (W.D.Pa. Mar. 1, 2007) (citing *Pennsylvania v. U.S. Dep't of Health & Human Serv.*, 101 F.3d 939, 945 (3d Cir. 1996) ("stating that conclusory assertions, unaccompanied by a substantial argument, will not suffice to bring an issue before the court").

For the reasons set forth above, the Court finds no reasonable jury could find that Defendants' conduct created an unreasonable risk of harm, and therefore, Defendants are entitled to summary judgment on Plaintiff's negligence claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that no material issues of fact exist with regard to Plaintiff's claims for intentional interference with existing contractual and business relationships (Counts I and II), intentional interference with prospective business relationships (Count III), defamation (Counts IV and V), breach of fiduciary duty (Count VI), and negligence (Count VII). Because the Court has concluded that Defendants are entitled to judgment as a matter of law as to all of these claims, the Court will grant Defendants' motion for summary judgment in its entirety.

An appropriate order will follow.

Dated: March 31, 2012                                    BY THE COURT:


                                                 __/s/ Lisa Pupo Lenihan_____ ___
                                                 LISA PUPO LENIHAN
                                                 Chief United States Magistrate Judge


cc:      All Counsel of Record
         *Via Electronic Mail*